UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT PAYNE and PAYNE INVESTMENTS LLC, | : | Civil Action |
| | : | |
| | : | No. 3:02 CV 2234 (AWT) |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| TAYLOR VISION RESOURCES, TAYLOR STRATEGIC ACQUISITIONS, TAYLOR STRATEGIC DIVESTITURES, and TAYLOR FINANCIAL SERVICES LLC, all defendants collectively operating under the name TAYLOR COMPANIES, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | MARCH 11, 2008 |

## JOINT TRIAL MEMORANDUM

Pursuant to the Court's Trial Memorandum Order dated May 25, 2007 (as most recently modified with respect to the date for filing by the Court's Order of March 3, 2008), plaintiffs Robert Payne and Payne Investments LLC (collectively, "Payne") and defendants Taylor Vision Resources, Taylor Strategic Acquisitions, Taylor Strategic Divestitures, and Taylor Financial Services LLC (collectively, "Taylor Companies") respectfully submit this Joint Trial Memorandum.

## I.    TRIAL COUNSEL

### Counsel for Plaintiffs:

Michael P. Berman, Esq.
Kevin W. Gillen, Esq.
Berman and Sable LLC
One Financial Plaza
Hartford, CT  06103
Tel: (860) 527-9699
Fax: (860) 527-9077
E-mail:  mberman@bermansable.com

**Counsel for Defendants:**

Douglas J. Varga, Esq. (ct18885)
Sarah W. Poston, Esq. (ct19702)
Zeldes, Needle & Cooper, P.C.
1000 Lafayette Boulevard
Bridgeport, CT  06604
Tel: (203) 333-9441
Fax: (203) 333-1489
E-mail:  dvarga@znclaw.com
        sposton@znclaw.com

## II.     JURISDICTION

### A.     Subject Matter Jurisdiction

1.     The jurisdiction of this Court is based on 28 U.S.C. § 1332 on the basis of the complete diversity of citizenship between the Plaintiffs and each of the Defendants and the amount in controversy is in excess of $75,000 exclusive of interest and costs.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

### B.     Personal Jurisdiction

Taylor Companies does not challenge the Court's exercise of personal jurisdiction.

## III.     JURY CASE

1.     A jury was requested with the filing of the Complaint (dated December 13, 2002), thus, this case will be tried to a jury.

2

## IV.    NATURE OF CASE

### A.    Plaintiffs' Claims

No claims have been abandoned or dismissed, except that the seventh cause of action, seeking an accounting, has been rendered moot.

The damages sought by the plaintiffs on a number of claims have been reduced as a result of payments made by the defendants and accepted by the plaintiffs, without prejudice, after the claims were asserted, and, in fact, after this case was commenced. The pertinent facts and claims to be tried are summarized as follows:

### First Claim for Relief - the Rexam/Mitek Transaction

The primary Claims for Relief (Claims One through Seven in the Complaint) are based upon a breach of a written employment contract. On or about November 20, 1999, the defendants, Taylor Vision Resources, Taylor Strategic Acquisitions, Taylor Strategic Divestitures, and Taylor Financial Services LLC (hereinafter, the "Taylor Companies"), made a written offer to the plaintiff, Robert Payne, to join their organization as its sole Managing Director. Robert Payne accepted the offer and began to work for the Taylor Companies in late December, 1999, as its Managing Director. Pursuant to the above-referenced contract of employment, Robert Payne was to receive, _inter alia_, the following as compensation:

1.    Annual draw against commissions of $125,000;

2.    Commissions of 10% on net revenues from contracts on which he "managed the transaction or the project" (hereinafter, the "Management Commission"). Commissions were to be paid within one month following closure of any transaction;

3

3.     Additional commissions of 5% on net revenues where Robert Payne "took responsibility for leading the marketing efforts with companies which the Taylor Companies had not served prior to his employment" with the Taylor Companies (hereinafter the "Marketing Commission"). In the event that a Taylor Companies' executive "directly assists" in "contract closure", the additional Marketing Commission would be reduced to 2.5%; and

4.     On the first $1,500,000 in net revenues generated from Payne leading the marketing efforts, a bonus commission of 5% above all commissions previously mentioned (hereinafter the "Bonus Marketing Commission"). As set forth in the letter sent to Robert Payne, this was offered since the Taylor Companies knew that by leaving his previous employer, Robert Payne would forfeit a $75,000 bonus that would shortly be coming due from said employer.

At the end of 2000, with the concurrence of the Taylor Companies, and in order to obtain certain tax benefits, Robert Payne established himself as a Limited Liability Company, Payne Investments, LLC (Robert Payne and Payne Investments, LLC, collectively, will hereinafter be referred to as "Payne" or "Plaintiffs").

Sometime between late January and late March of 2001 the Taylor Companies were engaged to sell Mitek, Inc. ("Mitek"), a wholly owned subsidiary of Rexam PLC (British parent company). In accordance with his contractual status at the Taylor Companies, Payne was appointed Managing Director for the project.

In early May 2001 Warren Buffet made an "unsolicited" offer for Mitek. Payne, who had been named and identified to Mitek as the Taylor Companies' Managing Director on the project, had been working and continued to work extensively in that capacity on the transaction in cooperation with Mitek personnel. In the meantime, Rexam PLC ("Rexam"), pursued the Buffett offer to a successful closure, and paid the fee due to the Taylor Companies pursuant to the engagement letter the parties had entered into. The Taylor Companies received $3,000,000 in net revenues on the transaction.

4

Under his employment agreement, Payne, as Managing Director, was entitled to a commission of $300,000 (less draw from the year 2001 of $128,792), or a total of $171,208, with interest from October 4, 2001.

**Second Claim for Relief - The Borden Chemical Transaction**

In the latter part of the year 2000, Payne contacted BCP Management Inc., which was the general partner of a limited partnership known as Borden Chemical & Plastics Operating Limited Partnership (hereinafter "Borden Chemical").

As a result of Payne having contacted Borden Chemical, the Taylor Companies were invited to make a presentation to Borden Chemical to discuss the services that it could provide. Payne was an active participant in the initial presentation.

A second meeting followed, again with Payne's participation. At the conclusion of that second meeting, Borden Chemical instructed the President of BCP Management Inc. to enter into negotiations with the Taylor Companies in an effort to reach an agreement in which the Taylor Companies would manage the sale of the limited partnership. Payne was designated to act on behalf of the Taylor Companies in these negotiations.

After the engagement contract between the Taylor Companies and Borden Chemical was concluded and executed, and while Payne was in the process of finalizing the offering memorandum, Borden Chemical filed for bankruptcy in April of 2001. Notwithstanding the bankruptcy filing, Borden Chemical wanted to continue the relationship they had entered into with the Taylor Companies. However, the Creditors Committee in the bankruptcy proceedings demanded that the terms of the original engagement contract between the parties be renegotiated.

5

Payne represented the Taylor Companies in negotiating a new engagement contract with the Creditors Committee and achieved "contract closure".

The Borden Chemical business was sold in several parts. The first sale involved the Borden Chemical facility in Addis, Louisiana. The sale generated a commission to the Taylor Companies of $1,000,000 in February of 2002 ($350,000 had been paid earlier and $650,000 was paid upon the actual closing of the transaction). Despite his work on this sale, no commission payments were made to Payne after the fee was earned by and paid to the Taylor Companies. As already documented, under his contract with the Taylor Companies, Payne, as the Managing Director of the project, was entitled to receive 10% of the fee paid to the Taylor Companies. Furthermore, Payne was entitled to receive an additional 5% of said fee as his Marketing Commission, for having led "the marketing efforts with [a] company that the Taylor Companies [had] not served prior to [his] employment". This would amount to a total commission of $150,000 on the fees earned at the time the first transaction closed, less any draw paid.

In April of 2002, a second sale of a Borden Chemical facility generated a commission to the Taylor Companies of $1,000,000. Pursuant to his contract with the Taylor Companies, Payne was entitled to 10% of those fees ($100,000) as his Management Commission and an additional 5% ($50,000) as his Marketing Commission.[1]

The third and final portion of the Borden Chemical deal closed on December 23, 2002 and yielded a fee to the Taylor Companies of $500,000. This fee resulted in a commission due to Payne of $75,000 (10% + 5% of the fee).

---

[1] In addition, these fees to the Taylor Companies, now equaling $2,000,000, would also count toward, and exceed the $1,500,000 in marketing fees that would entitle Payne to an additional 5% up to $75,000. At this point, the ceiling of $1,500,000 having been exceeded, Payne was entitled to the entire $75,000 Bonus Marketing Commission he had been promised. This Bonus Marketing Commission was not paid.

**Third Claim for Relief - The Dow/Sentrachem Transaction**

In the first quarter of 2001, Payne, along with two other representatives of the Taylor Companies, including Ralph Taylor, visited Dow Chemical Company ("Dow Chemical"). During this meeting, based upon research that he had performed, Payne suggested that it would be financially beneficial for Dow Chemical to sell one of its South African subsidiaries, known as Sentrachem. Dow Chemical recognized the potential benefit and readily adopted the idea.

Following that meeting, Payne undertook the negotiation of the engagement letter on behalf of the Taylor Companies, first, with Dow's head of corporate planning and strategic development, Brian Taylorson, and concluded the negotiations with Alfonso Escudero, the director of mergers & acquisitions for Dow. Once the engagement letter was executed, Payne began working on the transaction, with his assistant, Ken Griffin. Payne's work on the project included his attendance at the first two (of five) meetings in South Africa as Managing Director. He also worked on the "offering memorandum" and proposed changes to that document which were incorporated therein. However, when it became clear to Payne that the Taylor Companies were not honoring their obligation to pay him the compensation promised pursuant to his employment agreement (see claims set forth above), Payne declined to spend any more significant time on the Sentrachem project.

The Dow Chemical/Sentrachem transaction closed and generated a fee of $1,301,540 to the Taylor Companies. Thereafter, despite Payne's direct participation in and material contributions to the project, the Taylor Companies refused to pay Payne his commission of $130,154, which amount is now due and owing, with interest.

7

**Fourth Claim for Relief - Bonus Marketing Commission**

As stated in the Second Claim above, pursuant to the employment contract, Payne was promised a "Bonus Marketing Commission" of $75,000, once the net revenues to the Taylor Companies, from marketing efforts led by him, exceeded $1,500,000. The total of net revenues of $1,500,000 was achieved as soon as the first portion of the Borden Chemical transaction was closed and was certainly reached by the time all three (3) parts of that deal were closed.

**Fifth Claim for Relief - 401K Contributions**

Pursuant to his contract of employment, Payne was entitled to participate in the Taylor Companies' "401K Profit Sharing Plan". The Taylor Companies never provided Payne with access to the plan, nor allowed him to become a member. As a result, Payne was not given the benefit of "matching contributions", in the amount of $2,231.08 for the year 2000, or the year 2001, resulting in a loss to the plaintiffs of $4,462.16.

**Sixth Claim for Relief - Loss of Insurance**

As part of his employment contract, the Taylor Companies promised to pay for Payne's medical and dental insurance consistent with its group benefits program. However, even after Payne established himself as a limited liability company, with the knowledge and concurrence of the Taylor Companies, the Taylor Companies not only failed to provide medical and dental coverage to him, but improperly deducted the costs for those insurance plans from Payne's salary. Furthermore, the Taylor Companies failed and, in fact, refused to honor its promise to "gross up" payments to Payne to cover the costs of such insurance, which they were deducting from his salary, resulting in a loss to Payne of $17,928.95.

8

**Seventh Claim for Relief - Expenses**

Under his employment agreement with the Taylor Companies, Payne was to be provided with a laptop computer. However, the computer with which he was provided failed to work and he was directed by a representative of the Taylor Companies to purchase another one, for which he would be reimbursed. Payne purchased a replacement laptop computer, as he was directed, and submitted the receipt of said purchase for reimbursement. The Taylor Companies refused to honor its promise of reimbursement and Payne was not paid for the computer, which resulted to a loss to Payne in the amount of $3,000.

**Eighth Claim for Relief - Accounting**

Payne sought an accounting for the funds due and owing to him. Said accounting has been provided to him. This claim is, therefore, rendered moot.

**Ninth Claim for Relief - Unjust Enrichment**

Seeks recovery based upon the theory of "Unjust Enrichment", as the Taylor Companies have been greatly and unjustly enriched by the services rendered by Payne, as set forth in the first three (3) claims for relief.

**Tenth Claim for Relief - Promissory Estoppel**

Seeks to bar the Taylor Companies from denying the amounts due and owing to Payne, based upon the theory of "Promissory Estoppel".

**Additional Claim for Relief – Prejudgment Interest**

Seeks an award of statutory interest, pursuant to Conn. Gen. Stat. § 37-3a, based upon the fact that the monies claimed as due and owing to the Plaintiffs were wrongfully withheld by the Defendants and that equitable considerations warrant the payment of such interest.

**B.**    **Defendants' Defenses**

(1)    Certain counts of the Complaint (Counts Four, Five, and Six) fail to state any claim upon which relief can be granted.

(2)    Certain counts of the Complaint (Counts Four, Five, and Six) are preempted by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1061.

(3)    Plaintiffs' "Additional Claim for Relief – Prejudgment Interest" is inapplicable because plaintiffs' damages are not in a liquidated sum within the meaning of C.G.S. § 37a-3.

## V.    STIPULATIONS OF FACT AND LAW

### A.    Claims of Fact Stipulated as Undisputed

1.    Taylor Companies employed Payne from December 1999 until the late spring – early summer of 2002.

### B.    Claims of Law Stipulated as Undisputed

None.

## VI.    PLAINTIFFS' CONTENTIONS

### A.    Overview

1.    Plaintiff, Payne, is a citizen of Connecticut, residing at 263 Spring Valley Road, Ridgefield, Connecticut.

2.    Plaintiff, Payne Investments LLC, is a limited liability company, formed under the laws of the State of Connecticut, with offices at 263 Spring Valley Road, Ridgefield, Connecticut.

3.    Defendant Taylor Financial Services LLC is a limited liability company organized under the laws of the State of Delaware with its principal office, as of the time of the events alleged in the complaint, at 1215 Nineteenth Street NW, Washington, D.C. 20036.

4.    Defendant Taylor Strategic Divestitures, Ltd is a foreign corporation organized under the laws of Bermuda with its principal office, as of the time of the events alleged in the complaint, at 1215 Nineteenth Street NW, Washington D.C. 20036.

5.    Defendants Taylor Vision Resources and Taylor Strategic Acquisitions are foreign entities with their principal office, as of the time of the events alleged in the complaint, at 1215 Nineteenth Street NW, Washington, D.C. 20036.

6.    The defendants have collectively operated under the name, the "Taylor Companies".

7.    On or about November 20, 1999, the Taylor Companies sent a letter to Payne in the State of Connecticut.

8.    The letter of November 20, 1999 offered Payne the position of Managing Director at the Taylor Companies.

11

9.    In late December of 1999, Payne became employed by the Taylor Companies as Managing Director.

10.    At that time, Payne was the only salaried employee at the Taylor Companies with the title "Managing Director".

11.    Payne performed as a salaried employee for the Taylor Companies, operating primarily out of offices in the State of Connecticut.

12.    Payne received $113,191.03 in compensation from the Taylor Companies in the year 2000.

13.    At the end of the year 2000, Payne established Payne Investments, LLC.

14.    Payne Investments, LLC also operated out of the State of Connecticut.

The Rexam/Mitek Transaction

15.    In late 2000, or early January 2001, the Taylor Companies were engaged to sell Mitek, a wholly owned subsidiary of Rexam (the "Rexam/Mitek Transaction").

16.    In accordance with his status at the Taylor Companies, Payne was appointed Managing Director for the Rexam/Mitek Transaction.

17.    In early April of 2001, Payne met with the senior management of Mitek to review potential bidders the Taylor Companies had compiled.  Locating potential bidders was not a function of the Managing Director, although presenting them to the potential customer was one of the Managing Director's functions.

18.    The Mitek management requested that the list of potential bidders be expanded.

19.     Shortly thereafter, Eugene M. Toombs, the President, Chairman and CEO of Mitek, with the permission of Rexam, approached an unsolicited third party, Warren Buffet (Berkshire Hathaway, Inc.), as a possible buyer.

20.     Shortly thereafter, Warren Buffet made an offer to purchase Mitek.

21.     Neither Rexam nor Mitek ever complained about the services being provided by the Taylor Companies.

22.     Neither Rexam nor Mitek ever complained about the work performed by Payne on behalf of the Taylor Companies in attempting to locate a buyer for Mitek.

23.     Notwithstanding the Warren Buffet offer, Payne solicited and obtained a higher offer from another prospective buyer of Mitek (KKR), but Mitek chose to close the sale to Warren Buffet.

24.     Rexam timely paid the Taylor Companies the full fee that was due and owing to it pursuant to the engagement letter.

25.     No commission was paid to Payne for his work on the Mitek transaction.

26.     The Taylor Companies received $3,000,000 in net revenues from Rexam upon the sale of Mitek.

27.     In its letter to Payne, dated November 20, 1999, Payne would be compensated for services rendered to the Taylor Companies as Managing Director upon contract closure (i.e., signing of the fee agreement).

28.     Not only was the fee agreement signed with Mitek, but, in recognition of its obligation, Rexam paid the Taylor Companies the full commission.  Payne received nothing!

The Borden Chemical Transaction

13

29.     In the latter part of the year 2000, Payne contacted BCP Management Inc.

30.     BCP Management was the General Partner of a limited partnership known as Borden Chemical & Plastics Operating Limited Partnership (hereinafter "Borden Chemical").

31.     Payne was the sole source of the contract with Borden Chemical.

32.     Payne made a presentation to Borden Chemical.

33.     There was a second meeting between the Taylor Companies and Borden Chemical, in which several representatives of the Taylor Companies, including Payne, participated.

34.     At the conclusion of the second meeting, Borden Chemical instructed the President of BCP Management Inc. to enter into negotiations with the Taylor Companies in an effort to reach an agreement in which the Taylor Companies would manage the sale of Borden Chemical.

35.     Payne was the primary negotiator on behalf of the Taylor Companies in reaching a contract with Borden Chemical.

36.     Thereafter, in April, 2001, Borden Chemical filed for bankruptcy.

37.     The Creditors Committee in the bankruptcy proceedings wanted the terms of the Borden Chemical "engagement letter" with the Taylor Companies renegotiated.

38.     Payne negotiated the new contract with the Creditors Committee, on behalf of the Taylor Companies.

39.     Revised contract closure with Borden was achieved.

40.     The Borden Chemical business was sold in several parts.

14

41.    The first part of the Borden Chemical business sold was of their facility in Addis, Louisiana.

42.    This sale generated gross revenues to the Taylor Companies of $1,000,000 in February of 2002 ($350,000 had been paid earlier and $650,000 was paid upon closing of the transaction).

43.    The sale of the second portion of the Borden Chemical business in April of 2002 generated gross revenues to the Taylor Companies in the amount of $1,000,000.

44.    On or about December 18, 2002, the final sale of the Borden Chemical business resulted in gross revenues to the Taylor Companies in the amount of $500,000.

Dow/Sentrachem Transaction

45.    In the first quarter of 2001, Payne, along with other representatives of the Taylor Companies, including Ralph Taylor, visited with Pedro Rheinhard at Dow Chemical Company ("Dow Chemical"). Following the visit Dow Chemical agreed to retain the Taylor Companies to sell Sentrachem.

46.    Payne negotiated the terms of the engagement letter with Dow Chemical on behalf of the Taylor Companies.

47.    Following the execution of the engagement letter by Dow Chemical and the Taylor Companies, Payne began working on the transaction, with his assistant, Kenneth Griffin.

48.    The Dow Chemical/Sentrachem transaction closed in 2002 and generated funds to the Taylor Companies in the amount of $1,301,539 (Net revenues to Taylor Companies from this transaction, after deduction of senior advisor compensation, were $1,295,781.30).

15

49.     The Taylor Companies made no commission payments to Payne, following the completion and closure of the Dow Chemical transaction.

Letter Agreement

50.     The letter, dated November 20, 1999, from the Taylor Companies to Payne constitutes a valid and enforceable contract of employment between the parties.

Bonus Marketing Commission

51.     Total gross revenues received by the Taylor Companies for the Rexam/Mitek, Borden Chemical and Dow Chemical/Sentrachem transactions exceeded $1,500,000.

52.     The Taylor Companies did not make payment of the "Bonus Marketing Commission" to Payne.

Profit Sharing Plan

53.     Pursuant to his contract of employment, Payne was entitled to participate in the 401K profit sharing plan established by the Taylor Companies.

Medical Insurance

54.     The Taylor Companies deducted $275 from Payne's compensation each draw period (the draw was paid twice a month), which deductions totaled in excess of $6,000 by the end of October of 2000.

55.     At the end of 2000, Payne established himself as a Limited Liability Company ("Payne Investments, LLC"), with the knowledge and concurrence of the Taylor Companies.

Expenses

56.     Pursuant to his Contract of employment with the Taylor Companies, Payne was provided with a laptop computer.

57.    The laptop computer with which Payne was provided failed to work.

58.    Payne purchased a replacement computer and submitted the receipt to the Taylor Companies for reimbursement.

59.    The Taylor Companies did not reimburse Payne for the replacement computer.

Partial Payments

60.    A demand letter was sent to the Taylor Companies by Payne's attorneys, demanding payment of the amounts owed to him.  Thereafter, a partial payment of $154,418.30 was made in May of 2002, and accepted by Payne without prejudice.

61.    In 2002, the Taylor Companies made a payment to Payne of $37,500, accepted by Payne without prejudice.

62.    In December, 2002, a further payment was made in the amount of $62,500 and accepted by Payne without prejudice.

63.    In September, 2004, after this case was commenced, a further payment was made in the amount of $44,376 and accepted by Payne without prejudice.

64.    In addition, Payne received draws against commissions as follows:

2001:  $128,792

2002:  $ 48,077

Interest

65.    Plaintiffs' prayers for relief includes a claim for interest.

**B.    Particular Contentions**

1.    The primary Claims for Relief (Claims One through Seven in the Complaint) are based upon a breach of a written employment contract.  The basic elements of a claim for breach

17

of contract are documented and/or admitted. The Taylor Companies made a written offer to Payne to join their organization as its Managing Director. According to the Taylor Companies' representative who negotiated the contract (Kenneth Griffin), there were no terms agreed upon not set forth in that letter. Payne accepted the offer and began to work for the Taylor Companies on or about January 3, 2000.

2.      It is undisputed that during the course of Payne's employment three (3) transactions came to closure on which Payne was <u>named</u> as the Managing Director. The Taylor Companies initially refused to pay Payne for any of the services he rendered in accordance with the agreement of the parties. Demands were made upon Taylor Companies by counsel, which were only partially responded to. The Taylor Companies' explanations were rejected.

<u>The Year 2000 – Payne's Year of Employment</u>

3.      Payne joined the Taylor Companies in late 1999, (with an "official" starting date of January 3, 2000). At the time of his arrival, according to the representatives of the Taylor Companies, the Taylor Companies had only hired "Managing Directors" on a deal by deal basis. Payne was the first full time employee with this title. At the time of his arrival, and through 2000, the Taylor Companies were already involved in a number of potential transactions that had previously been originated by the Taylor Companies prior to Payne's arrival and which Payne was now required to manage. The assets, which the Taylor Companies were seeking to market at the time Payne arrived, proved to generate no meaningful interest in the market place. None of these transactions closed.

4.    During the early months following Payne's arrival, a number of other potential transactions were initiated. As with the transactions already in existence, most of these "new" transactions did not close either.

5.    By the end of 2000, however, the Taylor Companies were already in breach, as he was never given the opportunity to participate in the Taylor Companies' 401K Profit Sharing Plan, despite the fact that the employment agreement clearly stated that not only would he be allowed to participate, but that the Taylor Companies would match 25% of Payne's contributions up to the statutory limit.

6.    In addition, Payne was promised that the company would pay his medical and dental insurance after thirty (30) days of employment. However, although the Taylor Companies deducted from Payne's draw, approximately $275 each draw period (draw was paid twice a month), deducting in excess of $6,000 by the end of October of 2000, Payne was not given any medical or dental insurance plan. On information and belief, these deductions continued until the establishment of Payne Investments, LLC.

7.    Finally, Payne requested, in writing to Ralph Taylor, the Taylor Companies' Chairman, that his original contract be redefined, since under the existing arrangements, he was to be compensated only for his work on divestiture transactions. Under his compensation package, he would receive nothing for working on acquisitions. In fact, Payne was called upon to assist in acquisitions, but the Taylor Companies told Payne that the wording of the contract provided for compensation only for divestitures. Payne's request that his contract be redefined to include the work he was being called upon for acquisitions was ignored.

19

8.      In late 2000 and/or early 2001, Payne began to work on three different divestiture transactions, which, once completed, would generate specific commissions for him pursuant to his contract of employment

9.      However, as each transaction closed, the Taylor Companies failed to make payments of the amounts it owed Payne under his contract.  Despite demands to the Taylor Companies for the payment of monies which Payne claims were properly due and owing to him, these monies remained unpaid.

The Mitek Transaction

10.      Sometime between late January and late March of 2001 the Taylor Companies were engaged to sell Mitek, a wholly owned subsidiary of Rexam.  In accordance with his contractual status at the Taylor Companies, Payne was appointed Managing Director for the project, as is reflected in the documents issued by the Taylor Companies.

11.      Payne attended the "initial" meeting and, as the Managing Director, held subsequent meetings with Mitek.  These meetings served to gather information for the offering memorandum that would be distributed to potential buyers and to identify a method of structuring the offer in a manner more likely to achieve success.  In addition, he supervised the drafting of the prospectus.  The Taylor Companies conducted its buyer research to create a list of potential bidders (this was not part of Payne's responsibilities).

12.      In early April of 2001, Payne met with the senior management of Mitek to review the list of potential bidders that the Taylor Companies had compiled.  During that meeting the Mitek management representatives with whom he met requested that the list be expanded and Payne reported that request to the Taylor Companies.

13.    According to Ralph Taylor, at some point he claims to have received complaints from the head of Rexam (Rolf Börjesson) concerning the lack of progress for finding a buyer for Mitek. It bears particular emphasis that Rolf Börjesson, in his deposition in this case, denied having made any such complaints regarding the work being performed on his company's behalf by the Taylor Companies. It is noteworthy that there was no evidence of any nature presented to support that allegation, or that Payne had not properly performed his duties as Managing Director.

14.    In early May of 2001, Warren Buffett made an "unsolicited" offer for Mitek. According to the head of Rexam, this offer was the result of the head of Mitek (Eugene M. Toombs) contacting Buffett directly. The Taylor Companies were not involved in this solicitation. This offer apparently caused the Taylor Companies some concern, since their position is that this offer made the transaction more precarious. However, their own client (Börjesson) testified that the Buffet offer made the transaction much easier and left little else for the Taylor Companies to do on the project.

15.    After the Buffett offer was made, Payne suggested that the Taylor Companies get a "proving bid" from a third party (KKR), to support the Buffett offer. The KKR offer was procured and was, in fact, higher than the Buffet offer. Despite the higher offer from KKR, Rexam focused its efforts on trying to reach an agreement with Buffett, utilizing the services of the Taylor Companies occasionally. As a result, even though the closing was not with a buyer procured by the Taylor Companies, Rexam agreed to pay to the Taylor Companies the fee it was due under the engagement letter.

21

16.    The fee which the Taylor Companies received from Rexam generated $3,000,000 in net revenues on a transaction in which Payne was named and introduced to Mitek as the Managing Director and fulfilled all of the functions normally performed by a Managing Director. As Managing Director, pursuant to his contract of employment, Payne was entitled to a commission of $300,000 (less draw for the year of $128,792, or a total of $171,208), with interest from October 4, 2001.  The Taylor Companies contend, arbitrarily and without evidentiary support that Payne, although named as Managing Director, did not perform all of the duties of the Managing Director and, therefore, is entitled to no amount of the Managing Director's compensation under the employment contract.  The position of the Taylor Companies not to pay Payne his contractually earned compensation on the Mitek deal is a clear breach of the employment agreement as well as standards in the industry.

17.    It is Payne's contention that the offer from Warren Buffett was a direct result of the work he did as Managing Director.  In fact, the marketing scheme created by Payne succeeded, where others had previously failed, and placed Mitek squarely in a position to contact Buffett and present their company in a more favorable light.

18.    Once Warren Buffett made his offer, and it was accepted by Rexam, Payne performed whatever work was required of the Taylor Companies to allow the transaction to proceed smoothly.  Payne was in regular contact with the Mitek executives with whom he had been working, in order to make sure that the deal closed.

19.    It is Payne's unqualified position that he was the Managing Director on this project from beginning to end.  He was never told, orally or in writing, that there were any

22

problems with his performance, nor was he ever notified that he was being removed as Managing Director.

The Borden Chemical Transaction

20.    In the later part of the year 2000, after the Mitek transaction began moving toward closure, Payne contacted BCP Management, Inc., the General Partner of a limited partnership known as Borden Chemical & Plastics Operating Limited Partnership (hereinafter "Borden Chemical").

21.    Solely as a result of Payne's contacting Borden Chemical and discussing the services that the Taylor Companies could provide, the Taylor Companies were invited to make a presentation to Borden Chemical, in which Payne was a principle participant, in discussing the services that the Taylor Companies could provide.

22.    A second meeting followed, again with Payne's participation. At the conclusion of the second meeting, Borden Chemical instructed the President of BCP Management Inc. to enter into negotiations with the Taylor Companies, in an effort to reach an agreement in which the Taylor Companies would manage the sale of the limited partnership.  Payne was designated to act on behalf of the Taylor Companies in these negotiations.

23.    Payne was the only individual from the Taylor Companies who dealt with Borden Chemical in the substantive negotiation and finalization of the engagement letter.  In fact, Mark J. Schneider, Borden Chemical's President and CEO, fully supports Payne's role in the Borden Chemical divestiture project.

24.    In April of 2001, after the Borden Chemical engagement contract was concluded, and while Payne was in the process of finalizing the offering memorandum, Borden Chemical

23

filed for bankruptcy. Despite the bankruptcy filing, Borden Chemical wanted to continue the relationship it had entered into with the Taylor Companies, but the Creditors Committee in the bankruptcy proceedings wanted the engagement letter renegotiated. Payne was the sole individual at the Taylor Companies who negotiated the terms of the new contract and achieved "contract closure" (this is acknowledged in deposition testimony of representatives of the Taylor Companies).

25.    The absence of any other individual being involved in the negotiations which led to the eventual "contract closure" with Borden Chemical is significant, since, as previously documented, pursuant to Payne's contract with the Taylor Companies, he was entitled to the bonus of 5% Marketing Commission whenever he achieved "contract closure" without assistance from another Taylor Companies' executive. Payne spent a significant amount of time and effort to negotiate a new engagement letter with the Creditors Committee. That agreement was executed by the parties and became the "operative" engagement contract between Borden Chemical and the Taylor Companies.

26.    The Borden Chemical business was sold in several parts. The first sale of the facility in Addis, Louisiana, generated a commission to the Taylor Companies of $1,000,000 in February of 2002 ($350,000 had been paid earlier and $650,000 was paid on the closing of the transaction). No commission payment was made to Payne by the Taylor Companies when the fee was earned. Payne asserts that, pursuant to his employment contract, he was entitled to receive 10% of this sum, as the Managing Director on the project and an additional 5% in Marketing Commission, for having led "the marketing efforts with [a] company that the Taylor

Companies [had] not served prior to [his] employment". The commissions total $150,000 on the fees earned at the time the first transaction sold, less any draw paid.

27.    The second Borden Chemical sale generated another fee to the Taylor Companies of $1,000,000 in April of 2002. Once again, under his contract, Payne was entitled to 10% of these fees ($100,000) as his Management Commission and 5% ($50,000) as his Marketing Commission. However, Payne did not receive the commission which he earned for this sale.

28.    By this point (late March of 2002) Payne had already grown frustrated with Taylor Companies' failure to properly compensate him pursuant to the employment contract and with the lack of response by the Taylor Companies on his requests to redefine his contract to include acquisitions on which he was being asked to spend a great deal of time. He had received nothing on the closing of Mitek, which had occurred six months earlier, and nothing following the closing of the first Borden Chemical transaction in February of 2002.

29.    The third and final sale in the Borden Chemical deal closed on December 23, 2002 and resulted in a fee paid to the Taylor Companies of $500,000. Payne was due and owing a commission of $75,000 on this sale (10% + 5% Marketing Commission).

30.    Aside from not paying Payne at the time of the Borden Chemical closings, the Taylor Companies have now asserted that Payne was only entitled to 2.5% Marketing Commission because Payne was assisted by Dermot Coughlan in closing the contract with Borden Chemical. However, Mark J. Schneider of Borden Chemical testified in deposition that the only reason that his company had a business relationship with the Taylor Companies was because of Payne. Mr. Schneider further stated in his testimony that, if Payne was no longer with the Taylor Companies, there was no reason to maintain that relationship. In fact, it is

Payne's contention that the contribution made by Dermot Coughlan on the deal was limited to reviewing what Payne did, or acting upon Payne's instructions.

The Dow/Sentrachem Transaction

31.    In the first quarter of 2001, Payne visited with Pedro Reinhard at Dow Chemical Company ("Dow Chemical") with two other employees of the Taylor Companies, including Ralph Taylor. During this meeting, based upon research that Payne had previously done, Payne suggested to the Dow Chemical representatives that they should consider selling Dow Chemical's South African business, known as Sentrachem. Dow Chemical readily adopted the concept and Payne individually undertook the negotiations of the engagement with Dow Chemical.

32.    Once the engagement contract was signed, Payne initially worked on the transaction, with his assistant, Ken Griffin. However, when it became apparent that the Taylor Companies were not honoring their agreement to pay Payne the compensation he was properly due and owing, Payne allowed Griffin to work on the Sentrachem project. Thereafter, the Dow Chemical/Sentrachem transaction proceeded to close and eventually generated a fee of $1,301,540 to the Taylor Companies.

33.    The Taylor Companies refused to pay Payne his Management Commission of $130,154, although Payne was clearly the person who visualized the opportunity, participated in making the initial presentation and negotiated the engagement contract and achieved contract closure with Dow Chemical. He also attended the initial meetings in South Africa and assisted in drafting the offering memorandum.

34.     That amount of $130,154, with interest, remains due owing to Payne.

Loss of Bonus

35.     In his contract of employment, Payne was promised a bonus of $75,000, once payments from marketing efforts led by him exceeded $1,500,000 in net revenues to the Taylor Companies. This threshold amount of net revenues was achieved upon the closing of the first portion of Borden Chemical deal and certainly by the time all three sales transactions were closed.

401K Contributions

36.     Pursuant to his contract of employment, Payne was entitled to participate in the Taylor Companies 401K Profit Sharing Plan. The Taylor Companies never provided Payne with access to the plan, nor allowed him to become a member of such plan.

Sixth Statement of Claim – Loss of Insurance

37.     As part of his employment contract, the Taylor Companies promised to pay for Payne's medical and dental insurance. However, even after Payne established himself as a limited liability company ("Payne Investments, LLC"), with the knowledge and concurrence of the Taylor Companies, the Taylor Companies not only failed to provide him with medical and dental coverage, but also continued to improperly deduct the costs for that coverage from Payne's draw in the years 2001 and 2002 and failed to honor its promise to "gross up" Payne's draw to cover the costs of the insurance that were being deducted from his salary once Payne Investments, LLC was formed.

27

Seventh Claim for Relief

38.    As part of his employment contract, the Taylor Companies were to provide Payne

with a laptop computer.  However, the computer with which he was provided failed to work.

Payne purchased a replacement computer pursuant to the direction of the Taylor Companies and

sought reimbursement.  The Taylor Companies refused to reimburse him for the computer.

Eighth Claim for Relief

39.    Payne sought an accounting for the funds due and owing to him.  Said accounting

is no longer necessary and this claim is, therefore, rendered moot.

Ninth Claim for Relief

40.    This claim seeks recovery based upon the alternate theory of "Unjust

Enrichment", as the Taylor Companies have been unjustly enriched by Payne's services rendered

in accordance with his employment contract.  The Taylor Companies accepted Payne's services

for which he expected to be compensated and have not made payment for such.

Tenth Claim for Relief

41.    This claim seeks to bar the Taylor Companies from denying the monies due and

owing to Payne based upon the doctrine of "Promissory Estoppel".  The promises made by the

Taylor Companies to compensate Payne for the services, which he rendered pursuant to his

contract for employment, were clear and unambiguous.  Payne relied upon such promises to his

detriment and the Taylor Companies are, therefore, estopped from denying the amounts that are

due and owing to him.

## VII.    DEFENDANTS' CONTENTIONS

**(a)**    **Deal Compensation Claims.**

While employed by Taylor Companies, Payne worked on three corporate divestitures for which he claims compensation in this case. The factual basis for Taylor Companies' position as to each of the deals is set forth below:

- **Rexam / Mitek**. This deal involved a divestiture by a United Kingdom-based company (Rexam PLC) of its St. Louis-based subsidiary (Mitek Corp.). Taylor Companies' founder and chairman (Ralph Taylor) and the company's vice chairman (Dermot Coughlan) had primary responsibility for this deal. Although Payne initially was listed as "managing director" on documents for this transaction, his actual involvement in the transaction was quite limited. He had no involvement in the ultimate closing of the deal; therefore, he did not "manage the transaction to closure" so as to be entitled to 10% of the net revenues from the deal under his agreement with Taylor Companies.

Notwithstanding Payne's limited involvement in the Rexam / Mitek deal, he received payment amounting to a little over 4.38% of the $2,940,000 Taylor Companies received in net revenues: Payne's 2001 draw was $128,792, none of which was owed to him for work on any other deal.

Furthermore, Payne makes <u>no</u> <u>claim</u> for leading the marketing efforts on the Rexam / Mitek transaction and, therefore, cannot reasonably count revenues generated in that transaction toward the $1,500,000 in net revenues needed to qualify for the $75,000 bonus.

- **Borden Chemical**. This deal involved the prospective divestiture (by sale or merger) of a financially-troubled Louisiana-based company, Borden Chemicals & Plastics

Management Corp. ("Borden"). Prior to joining Taylor Companies, Payne had engaged in business dealings with Borden's President and CEO (Mark Schneider), and Payne initiated the discussions that resulted in Borden's ultimate retention of Taylor Companies. Payne also had primary responsibility for the management of this deal.

Taylor Companies fully acknowledges the competency Payne demonstrated on this transaction, and it has compensated him fully for his efforts: It paid Payne a 2.5% commission for his marketing efforts, and a 10% commission on net revenues for managing the transaction: Payne received payment in the amount of $306,250 in 2002 for his work on the Borden transaction. In a subsequent payment made in 2004, he received the remainder of the compensation he was owed on this transaction. Because Ralph Taylor, Dermot Coughlan, Warren Bellis, and other Taylor executives, directly assisted in contract negotiation and closure with Borden Chemicals & Plastics Management Corp., however, Payne has received an additional 2.5% commission for his part in leading the marketing efforts, rather than the full 5% he claims.

- **Dow / Sentrachem**. This deal involved Dow Chemical Company's divestiture of a South African-based subsidiary (Sentrachem Corp.). Payne had some involvement in this matter initially, but has admitted that he ceased working on the deal before it was completed. Ken Griffin, another Taylor Companies employee, acted as managing director on this transaction, traveling 11 times to South Africa and seeing the deal through to closure.

In compensation for his work managing the Dow / Sentrachem deal, Ken Griffin received almost all of the 10% commission on net revenues. Payne received $2,943.53 in commission on this deal.

(b)     **Bonus Commissions Claim**  The Letter Agreement provided that on the first $1,500,000

net revenues Taylor Companies received from Payne leading the marketing efforts, Taylor would

pay a bonus commission of 5% above all commissions previously mentioned.  This percentage

was to be reduced to 2.5% in those instances in which another Taylor Companies executive had

directly assisted in contract closure.  Payne has been paid $37,500 based on his contribution to

leading the marketing efforts in Borden, but would be entitled to the additional $37,500 he

claims only if he had led the marketing effort on Borden and received no assistance in contract

closure from Dermot Coughlan or any other Taylor executive.

(c)     **Other Compensation Claimed.**  As to the three incidental items about which Payne

makes claims, he alleges he is entitled to $4,462.00 in connection with the Taylor 401K plan,

$17,929.00 for medical and dental payments, and $3,000.00 for a computer he purchased.  As to

the 401k claims, Payne voluntarily changed his status as employee at the end of 2000, when he

became an independent contractor and formed the LLC.  While he was an employee, Taylor

Companies made the 401k payments, which it could no longer make when Payne changed his

status.  As to the medical and dental payments, Taylor has made all payments owed.  Finally,

Payne purchased, without Taylor Companies' approval, a computer for approximately $3,000.00,

which was more expensive than the one Taylor Companies originally purchased for him.  Payne

still possesses the original which he claims was broken.  He is entitled to no additional payment.

## VIII.  <u>LEGAL ISSUES</u>

### A.    <u>Plaintiffs' Legal (and mixed legal/fact) Issues</u>

Whether under the terms of the employment agreement:

1)    Payne, as Managing Director of the Rexam/Mitek transaction is entitled to be paid his commission when the transaction to which he has been assigned goes to contract closure, a deal closes with a third party who was not procured for the client by the Taylor Companies, the client recognizes its obligation under the engagement contract and pays the Taylor Companies its full fee;

2)    Any "executive level employee of Taylor Companies 'directly assisted' in 'contract closure'" in the Borden Chemical Transaction;

3)    Payne was entitled to full commission as Managing Director of the Dow Chemical/Sentrachem Transaction where he achieved contract closure, but permitted another Taylor Companies' executive to close the deal when it was clear that the Taylor Companies were not honoring their contractual obligations to him on the Mitek and Borden Chemical transactions;

4)    Payne is entitled to the full $75,000 "Bonus Marketing Commission", as called for in the employment agreement;

5)    Payne is entitled to the "matching contributions" under the Taylor Companies 401k Profit Sharing Plan for the period of time in which he was employed by the Taylor Companies;

6)      Payne is entitled to recover the amounts deducted from his compensation by the Taylor Companies for medical and dental insurance coverage when he was never covered under said medical and dental insurance plans;

7)      Payne was entitled to receive the amounts equal to the costs of such medical and dental coverage from the Taylor Companies after he established himself as a limited liability company;

8)      Payne is entitled to recover the cost of the computer that he purchased at the direction of the Taylor Companies to replace the inoperable computer that was provided to him by the Taylor Companies.

B.      Whether Payne is entitled to recover from the Taylor Companies based upon the theory of unjust enrichment, given the fact that the Taylor Companies benefited from the services performed by Payne and failed to properly compensate him for those services, and such failure to pay Payne was to his detriment.

C.      Whether Payne is entitled to recover from the Taylor Companies based upon the doctrine of promissory estoppel, given the fact that the Taylor Companies made promises to compensate Payne for the services he rendered; the Taylor Companies reasonably expected that Payne would perform his duties under the employment agreement pursuant to such promises; and, that Payne actually and reasonably relied upon those promises to his detriment.

### B.    Defendants' Legal Issues

**(a)    Breach of Contract.**

(1)    Whether Taylor Companies failed to pay Payne all sums to which he was entitled for his work on the Rexam/Mitek deal in accordance with the terms of the parties' contract.

(2)    Whether Taylor Companies failed to pay Payne all sums to which he was entitled for his work on the Dow/Sentrachem deal in accordance with the terms of the parties' contract.

(3)    Whether Taylor Companies failed to pay Payne all sums to which he was entitled for his work on the Borden Chemicals deal in accordance with the terms of the parties' contract.

(4)    Whether Taylor Companies owes Payne any additional payment on any of the incidental claims based on his 401(k) plan, his medical and dental benefits, or his purchase of a computer.

**(b)    Damages.**

(1)    Whether, to the extent he is entitled to payment of additional amounts by Taylor Companies, Payne is entitled to an award of interest on those amounts.

## IX.    VOIR DIRE QUESTIONS

Plaintiffs' proposed voir dire questions are attached hereto as **Exhibit A**.

Defendants' proposed voir dire questions are attached hereto as **Exhibit B**.

## X.    LIST OF WITNESSES

### A.    Plaintiffs' Witnesses:

1)    Robert Payne - 260 Spring Valley Road, Ridgefield, CT

Mr. Payne will testify as to his performance under the contract of employment that he entered into with the Taylor Companies and offer testimony in support of his claim for monies owed by the defendants to the plaintiffs thereunder.

2)    David Epstein – Bentley Associates L.P., 101 Park Avenue, New York, NY

Mr. Epstein is an expert retained and disclosed by the plaintiffs. His testimony will assist the jury in understanding the nature and function of the position of Managing Director in the investment banking industry and in purchase and sale transactions, as well as the purpose and structure of employment contracts for Managing Directors in such endeavors. He will further testify that, pursuant to his review and analysis of Robert Payne's performance on the three (3) projects upon which he worked, the plaintiffs are entitled to the compensation they are claiming as due and owing from the defendants. (In order to more fully comply with the Court's Trial Memorandum Order, dated February 29, 2008, a copy of Mr. Epstein's report is attached hereto as **Exhibit C**).

3)    Thomas Bohle - 4301 N. Fairfax Drive, Suite 301, Arlington, VA 22203

Mr. Bohle will testify regarding Payne's overall performance as Managing Director for the defendants.

4)    Eugene M. Toombs - 14515 N Outer 40, Chesterfield, MO

Mr. Toombs will testify regarding Robert Payne's performance as Managing Director for the defendants on the Rexam/Mitek transaction.

5)    Mark J. Schneider –

Mr. Schneider will testify regarding Robert Payne's performance as Managing Director for the defendants on the Borden Chemical transaction.

(6)    Any witnesses listed by, but not called by the Defendants..

(7)    Any witnesses necessary to rebut the testimony of witnesses offered by the Defendants.

35

**B.**    **Defendant's Witnesses:**

    **(1)**    **Ralph Taylor**
             **Chairman and Chief Executive Officer**
             **Taylor Companies**
             **1128 16th Street N.W.**
             **Washington, DC 20036**

Mr. Taylor will testify about the circumstances leading to Taylor Companies' hiring of Payne as an employee; Payne's general duties and responsibilities as a Taylor Companies employee; Payne's performance generally; Payne's performance with respect to the Borden, Dow/Sentrachem, and Rexam/Mitek deals specifically; the determination of Payne's compensation; Payne's interaction with other Taylor Companies' personnel; and Payne's purported damages.

    **(2)**    **Dermot Coughlan**
             **Taylor Companies**
             **1128 16th Street N.W.**
             **Washington, DC 20036**

Mr. Coughlan will testify about the circumstances leading to Taylor Companies' hiring of Payne as an employee; Payne's general duties and responsibilities as a Taylor Companies employee; Payne's performance generally; Payne's performance with respect to the Borden, Dow/Sentrachem, and Rexam/Mitek deals specifically; the determination of Payne's compensation; Payne's interaction with other Taylor Companies' personnel; and Payne's purported damages.

(3)    **Warren Bellis**
**Taylor Companies**
**1128 16th Street N.W.**
**Washington, DC 20036**

Mr. Bellis will testify about the circumstances leading to Taylor Companies' hiring of

Payne as an employee; Payne's general duties and responsibilities as a Taylor Companies

employee; Payne's performance generally; Payne's performance with respect to Borden,

Dow/Sentrachem, and Rexam/Mitek deals specifically; the determination of Payne's

compensation; Payne's interaction with other Taylor Companies' personnel; and Payne's

purported damages.

(4)    **Kenneth Griffin**
**BGR Holding, LLC**
**1275 Pennsylvania Avenue NW**
**Tenth Floor**
**Washington, DC 20004**

Mr. Griffin will testify about Payne's general duties and responsibilities as a Taylor

Companies employee; Payne's performance generally; Payne's performance with respect to the

Borden, Rexam/Mitek, and particularly the Dow/Sentrachem deals specifically; the

determination of Payne's compensation; Payne's interaction with other Taylor Companies'

personnel; and Payne's purported damages.

(5)    **Rachel Lane**
**Taylor Companies**
**1128 16th Street N.W.**
**Washington, DC 20036**

Ms. Lane will testify about Payne's general duties and responsibilities as a Taylor

Companies employee; Payne's interaction with other Taylor Companies' personnel; and Payne's

purported damages.

(6)    **Robert Payne**
**260 Spring Valley Road**
**Ridgefield, CT  06877**

Mr. Payne will testify about the circumstances leading to his employment relationship

with Taylor Companies; his general duties and responsibilities as a Taylor Companies employee;

his performance generally while employed by Taylor Companies; his performance with respect

to the Borden, Dow/Sentrachem, and Rexam/Mitek deals specifically; his interaction with other

Taylor Companies' personnel; and his purported damages.

(7)    **Any witnesses listed by, but not called by, Payne.**

(8)    **Any witnesses necessary to rebut the testimony of witnesses offered by Payne.**

## XI.    EXHIBITS

A.    **Plaintiffs' Exhibits:**

| No. | Description | Defendants' Objections |
|---|---|---|
| 1. | Letter Contract of Employment signed by Ken Griffin, dated November 20, 1999, Bate Stamped #'s 04528-04529 | |
| 2. | Robert Payne e-mail to Rachel Taylor regarding "Gross-up income", dated January 7, 2001, Bate Stamped #04513 | |
| 3. | Borden executed Engagement Letter, dated January 16, 2001, Bate Stamped #'s 04416-04421 | |
| 4. | Borden signed Engagement Letter, dated January 17, 2001, Bate Stamped #'s 04410-04415 | |
| 5. | Dow signed Engagement Letter, dated January 29, 2001, Bate Stamped #'s 04404-04408 | |
| 6. | Mitek signed Engagement Letter dated February 2, 2001 (by R. Taylor).  Bate Stamped #'s 04434-04438 | |
| 7. | Robert Payne Memo to R. Taylor, dated February 16, 2001 | |
| 8. | Robert Payne letter to R. Taylor, dated February 24, 2001 | |
| 9. | Offer letter from Buffett to Toombs (Mitek), dated April 6, 2001, Bate Stamped #'s 04371-04372 | |
| 10. | Offer from KKR to Taylor for Mitek $435mm, dated May 22, 2001, Bate Stamped #'s 04382-04384 | |
| 11 | Congratulations letter from R. Taylor to Börjesson on Mitek | |

| | | |
|---|---|---|
| | sale, dated June 13, 2001, Bate Stamped #'s 04390-04391 | |
| 12 | Letter from Robert Payne to R. Taylor – seeking "acquisition agreement" dated, July 22, 2001, Bate Stamped #'s 0108-0110 | |
| 13 | Letter from Robert Payne to R. Taylor – seeking Biogen-specific deal, dated July 25, 2001 | |
| 14 | Borden signed Engagement Letter, dated August 24, 2001 (by R. Taylor), Bate Stamped #'s 04428-04433 | |
| 15 | Borden signed Engagement Letter, dated September 10, 2001 (by R. Taylor), Bate Stamped #'s 04422-04427 | |
| 16 | Robert Payne e-mail to R. Taylor – seeking comp. plan, dated November 7, 2001, Bate Stamped #0111 | |
| 17 | Robert Payne e-mail to R. Taylor – seeks meeting, dated November 21, 2001, marked as Plaintiffs' Deposition Ex. 23 | |
| 18 | Dow Engagement Extension Letter, dated January 4, 2002 (by R. Taylor) Bate Stamped #04409 | |
| 19 | Dittbrenner (Taylor) letter to Robert Payne regarding outside employment, dated January 7, 2002, Bate Stamped #'s 04539-04540 | |
| 20 | Robert Payne letter to R. Taylor regarding Dittbrenner letter, dated January 21, 2002, Bate Stamped #'s 04541-04542 | Relevance |
| 21 | Corwell e-mail to Rachel Taylor, dated January 25, 2002, Bate Stamped #'s 04547-04548 | Cumulative Relevance |
| 22 | Robert Payne e-mail to R. Taylor regarding "success fees," dated, March 5, 2002, marked as Plaintiffs' Deposition Ex. 26 | |
| 23 | Robert Payne e-mail to R. Taylor regarding Borden fees dated, March 8, 2002, marked as Plaintiffs' Deposition Ex. 27 | |
| 24 | R. Taylor e-mail to Stein forwarding above Robert Payne e-mail, dated March 8, 2002, Bate Stamped #0113 | Cumulative Relevance |
| 25 | Robert Payne e-mail to Ralph Taylor: Fraser told that Robert Payne quit, dated March 9, 2002, marked as Plaintiffs' Deposition Ex. 28 | |
| 26 | Ralph Taylor e-mail to Stein forwarding above Robert Payne e-mail "what should I do" dated, March 10, 2002, Bate Stamped #0112 | Cumulative Relevance |
| 27 | Dow Management Presentation by Taylor bate stamped #'s 0174-0293, marked "confidential" | |
| 28 | Dow Executive Summary, (by Taylor Companies), Bate Stamped #'s 4114-4119, marked "confidential" | |
| 29 | Dow Initial Planning Meeting Agenda and Planning Document, Bate Stamped #'s 1783-1832, marked "confidential" | |
| 30 | Borden Initial Planning Meeting Agenda and Planning Document, Bate Stamped #'s 1012-1048, marked | Relevance |

| | | |
|---|---|---|
| | "confidential" | |
| 31 | Proposed questions for Key Decision Makers regarding Borden, Bate Stamped #'s 0824-0857, marked "confidential" | Relevance |
| 32 | Target Company information for Borden deal, Bate Stamped #'s 0858-0859, marked "confidential" | Relevance |
| 33 | Confidentiality Agreement on Borden deal from Robert Payne to Westlake Polymers, dated April 3, 2001, Bate Stamped #'s 0861-0867, marked "confidential" | Relevance |
| 34 | Confidentiality Agreement from Robert Payne to Wexford International, Inc., dated April 2, 2001, Bate Stamped #'s 0868-0871, marked "confidential" | Relevance |
| 35 | E-mail from Mark J. Schneider of Borden to Robert Payne, dated February 13, 2001, in response to Robert Payne's e-mail dated February 8, 2001, Bate Stamped #'s 1001-1002, marked "confidential" | Relevance |
| 36 | Four (4) Agreement Letters from Robert Payne to Mark J. Schneider of Borden confirming verbal agreements to contact prospective buyers, Bated Stamped #'s 0790-0794 | Relevance |
| 37 | Letter from Jacob Stein to Robert Payne's counsel dated May 8, 2002 regarding payment of $154,418.30 with attached copy of check in that amount, and additional documentation | |
| 38 | W-2 Wage and Tax Statement for the year 2000 from Taylor International Inc. to Robert Payne | |
| 39 | Taylor Pay stub receipt, dated February 15, 2001, regarding deposit into the account of Robert Payne | |
| 40 | Taylor Pay stub Detail for check to Robert Payne, dated January 20, 2000 | |
| 41 | Taylor Companies Insurance rate for D.C. personnel Aetna/US Health Plan as of January 1, 2000 | |
| 42 | Letter from TFS (Cornwell) to Robert Payne, dated August 27, 2002, regarding TFS filing forms with NASD to terminate employment | |
| 43 | Form U-5 Uniform Termination Notice for Securities Industry Registration for Robert Payne, dated August 22, 2002 | |
| 44 | Taylor Customer Quick Reports showing amounts paid on the Borden, Rexam/Mitek and Dow-Sentrachem deals, Bate Stamped #'s 0160-0162 marked "confidential" | |
| 45 | Defendants' Calculation of Compensation, received via facsimile from counsel for defendants, dated September 3, 2004 | |
| 46 | Copy of check from Taylor Companies, Inc. to Payne Investments, LLC in the amount of $44,375.61, dated September 21, 2004 | |

| | | |
|---|---|---|
| 47 | Letter, dated May 8, 2002, from Jacob Stein to Attorney Donahue regarding the Taylor check payable to Robert Payne in the amount of $154,418.30, with copy of the check and information relevant to the check attached, Bate Stamped #'s 0163-0165 | Cumulative |
| 48 | Letter, dated October 9, 2002, from Jacob Stein to Attorney Crystal regarding the check in the amount of $37,500.00 from Taylor International, Inc. to Payne Investments, LLC, dated October 7, 2002 with attached IRS 1099 Form for 2002, 2001 and 2000, along with a Form W-2 for 2000, Bate Stamped #'s 0166-0171 | |
| 49 | Letter, dated October 15, 2002, from Attorney Crystal to Jacob Stein regarding the check to Robert Payne in the amount of $37,500.00, containing the counter-signature of Jacob A. Stein, Esq. | |
| 50 | U.S. Individual Income Tax Return 1040 for the year 2000 for Robert Payne and Payne Investments, LLC, along with relevant W-2 and 1099 Forms | |
| 51 | U.S. Individual Income Tax Return 1040 for the year 2001 for Robert Payne and Payne Investments, LLC, along with relevant W-2 and 1099 Form | |
| 52 | U.S. Individual Income Tax Return 1040 for the year 2002 for Robert Payne and Payne Investments, LLC, along with relevant 1099 Form | |
| 53 | Flow Chart for Taylor Strategic Divestiture (6 pages), showing duties of team members on a divestiture project. This document was pencil-marked by Robert Payne identifying his duties on the Dow-Sentrachem deal. It was marked for identification as Exhibit 1 by the plaintiffs in a deposition on March 14, 2005 and was also marked as defendants' exhibit for identification on May 13, 2005 | Hearsay |
| 54 | Flow Chart for Taylor Strategic Divestiture (6 pages), showing duties of team members on a divestiture project. This document was pencil-marked by Robert Payne identifying his duties on the Dow-Rexam/Mitek deal. It was marked for identification as Exhibit 1 by the plaintiffs in a deposition on March 14, 2005 and was also marked as defendants' exhibit for identification in a deposition on May 13, 2005 | Hearsay |
| 55 | Flow Chart for Taylor Strategic Divestiture (6 pages), showing duties of team members on a divestiture project. This document was pencil-marked by Robert Payne identifying his duties on the Dow-Borden Chemical deal. It was marked for identification as Exhibit 1 by the plaintiffs in a deposition on | Hearsay |

| | | |
|---|---|---|
| | March 14, 2005 and was also marked as defendants' exhibit for identification in a deposition on May 13, 2005 | |
| 56 | Mitek Offering Memorandum prepared by Taylor Strategic Divestitures, showing Robert Payne as Managing Director | |
| 57 | Rexam/Mitek Intell sheet, as of: 4/30/01 Marked as "Confidential", marked as Plaintiffs' Deposition Ex. 9 | |
| 58 | Policies and Procedures of the Taylor Companies, dated 2000, Bate Stamped #'s 0461-0502, marked as Plaintiffs' Deposition Ex. 14 | |
| 59 | Taylor Strategic Divestitures Internal Memorandum outlining transaction responsibilities for each team member (7 pages) | |
| 60 | Report of David B. Epstein of Bentley Associates, L.P., dated March 7, 2006 | Hearsay<br><br>Not disclosed per scheduling order and Fed.R.Civ.P. 26(a)(2); see Taylor Companies' Motion to Preclude Expert Witness Testimony (Ex. H) |
| 61 | Travel Log for Robert Payne for January 19, 2001 (Mitek) | |
| 62 | Travel Log for Robert Payne for February 27, 2001 (Mitek) | |
| 63 | Travel Log for Robert Payne for April 17, 2001 (Mitek) | |
| 64 | Travel Log for Robert Payne for March 8, 2001 (Dow-Sentrachem) | Incomplete |
| 65 | KKR Investment Model (three pages) | |
| 66 | KKR Script | |
| 67 | Draft text prepared by Robert Payne for Offering Memorandum on Borden for Target Acquisition Companies, Bate Stamped #'s 0404-0414, marked "confidential" | Relevance |
| 68 | Information regarding Target Acquisition Companies on the Dow-Sentrachem deal, Bate Stamped #'s 0080-0086, marked "confidential" | |
| 69 | Information regarding Target Acquisition Companies on the Borden Chemicals & Plastics, L.P., Bate Stamped #'s 0096-0106, marked "confidential" | Relevance |
| 70 | Information regarding Target Acquisition Companies on the Rexam/Mitek, Bate Stamped #'s 0087-0095, marked "confidential" | |
| 71 | Detailed Invoices for travel charges for Rexam/Mitek, Bate Stamped #'s 0153-0159, marked "confidential" | |

| 72 | Detailed Invoices for travel charges for Dow Chemical, Bate Stamped #'s 0135-0147, marked "confidential" | |
| 73 | Detailed Invoices for travel charges for Borden Chemical, Bate Stamped #'s 0115-0134, marked "confidential | Relevance |
| 74 | Taylor Companies Customer Quick Report indicating the compensation received by Taylor for the Mitek, Borden and Dow deals, Bate Stamped #'s 0160-0162, marked "confidential" | Cumulative |
| 75 | E-mail from Robert Payne to Ralph Taylor and Dermot Coughlan, regarding "BCP Fee Agreement", dated July 5, 2001, Bate Stamped #4290, marked "confidential" | |
| 76 | E-mail from Robert Payne to Ralph Taylor and Dermot Coughlan, regarding "BCP Agreement – Final Revisions", dated July 5, 2001, Bate Stamped #4297, marked "confidential" | |
| 77 | Unsigned Letter from Dermot Coughlan to Mark J. Schneider of Borden Chemicals, dated January 11, 2001, Bate Stamped #4276, marked "confidential" | |
| 78 | Confidential Facsimile, dated July 5, 2001, to Dermot Coughlan from Robert Payne, Bate Stamped #4289, marked "confidential" | |
| 79 | Letter from Dermot Coughlan (Taylor) to Mark J. Schneider of Borden, dated January 10, 2001, Bate Stamped #4271, marked "confidential" | |
| 80 | Offering Memorandum for Borden Chemicals and Plastics Operating Limited Partnership, Bate Stamped #'s 0369-0402, marked "confidential" | Relevance |
| 81 | Master Task List (two pages) | |
| 82 | Managing Director List of Duties (three pages) | |
| 83 | Chlorchem Information Memorandum Draft I (thirty pages) | |
| 84 | E-mail from Bob Payne to Ralph Taylor, dated July 5, 2001, date stamped No. 4297, marked "confidential", marked as Plaintiff's Exhibit 3 in Deposition 3/15/05 | Cumulative |
| 85 | E-mail from Bob Payne to Ralph Taylor and Dermot Coughlan dated July 5, 2001, bate-stamped No. 4290, marked as "confidential", marked as Plaintiffs' exhibit 4 in Deposition of 3/15/05 | Cumulative |
| 86 | Letter from Dermot Coughlan to Mark Schneider, dated January 11, 2001, bate-stamped No. 4283, marked as "confidential", marked as Plaintiffs' Exhibit 5 in Deposition of 3/15/05 | |
| 87 | Letter to Mark Schneider from Dermot Coughlan, dated January 10, 2001, bate stamped No. 4271, marked as | |

| | | |
|---|---|---|
| | "confidential", marked as Plaintiffs' Exhibit 6 in Deposition of 3/15/05 | |
| 88 | Mitek Offering Memorandum cover sheet, marked as "confidential", marked as Plaintiffs' Exhibit 7 in deposition of 3/15/05 | |
| 89 | Letter from Taylor International to Brian Taylorson of Dow Chemical, dated February 26, 1996, bate stamped Nos. 4369-4376, marked as Plaintiffs' Exhibit 12 in Deposition of 3/16/05 | |
| 90 | Letter from Taylor Companies to Alfonso at Escudero of Dow Chemical, dated January 29, 2001, bate stamped Nos. 0069-0074, marked "confidential", marked as Plaintiffs' Exhibit 13 in Deposition of 3/16/05 | |
| 91 | Defendant's calculation of compensation owed, marked as Plaintiffs' Exhibit 15 in Deposition of 3/16/05 | Cumulative |
| 92 | Aetna Direct Payment connection form, bate stamped Nos. 0504-0507, marked as Plaintiffs' Exhibit 16 in Deposition of 3/16/05 | |
| 93 | Memo to Ralph Taylor on compensation from Robert Payne (sent via e-mail 2/16/01), marked as Plaintiffs' Exhibit 17 in Deposition of 3/17/05 | Cumulative |
| 94 | Letter from Robert Payne to Ralph Taylor, dated 2/24/01, marked as Plaintiffs' Exhibit 18 in deposition of 3/17/05 | Cumulative |
| 95 | Letter from Robert Payne to Ralph Taylor, dated July 22, 2001, bate stamped Nos. 0108-0110, marked as Plaintiffs' Exhibit 19 in Deposition of 3/17/05 | Cumulative |
| 96 | Letter from Robert Payne to Ralph Taylor, dated July 25, 2001, marked as Plaintiffs' Exhibit 20 in Deposition of 3/17/05 | Cumulative |
| 97 | E-mail from Robert Payne to Ralph Taylor, dated November 7, 2001 regarding compensation plan, marked as Plaintiffs' Exhibit 21 in Deposition of 3/17/05 | Cumulative |
| 98 | E-mail from Robert Payne to Ralph Taylor, dated November 7, 2001, bate stamped No. 0111, marked as Plaintiffs' Exhibit 22 in Deposition of 3/17/05 | Cumulative |
| 99 | Letter from Robert Payne to Ralph Taylor, dated January 21, 2002, marked as Plaintiffs' Exhibit 24 in Deposition of 3/17/05 | Cumulative |
| 100 | E-mail from Coleen Corwell to Rachel Taylor, dated January 25, 2002, bate stamped Nos. 0107 and 0114, marked as Plaintiffs' Exhibit 25 in Deposition of 3/17/05 | Cumulative |
| 101 | E-mail from Bob Payne to Ralph Taylor, dated March 8, 2002, regarding BCP Fees, marked as Plaintiffs' Exhibit 27 in Deposition of 3/17/05 | Cumulative |
| 102 | Plaintiffs' Damage Analysis | Hearsay Foundation |

| 103 | Letter from Atty. Donohue to Atty. Stein, dated May 10, 2002, countersigned by Stein (Re: payment of $154,418.30 w/out prejudice to parties). | Cumulative |
|-----|---|---|

The Plaintiffs reserve the right to introduce additional exhibits (a) to the extent they have been identified below by the Defendants, but are not offered; and (b) as necessary at trial, including for purposes of impeachment and/or rebuttal of evidence offered by Defendants.

**B.    Defendants' Exhibits:**

| No. | Date | Description | Plaintiff's Objections |
|-----|------|-------------|------------------------|
| 1 | 11/20/99 | Letter Agreement between Payne and Taylor Companies | |
| 2 | | Mitek Transaction History | Plaintiffs reserve their right to object to this exhibit, based upon further investigation.. |
| 3 | 12/15/00 | Letter from Ralph C. Taylor to Rolf Börjesson | Hearsay, Materiality, Foundation, Authenticity |
| 4 | 1/26/01 | Letter from Dermot G. Coughlan to Rolf Börjesson | Hearsay, Foundation Materiality, Authenticity |
| 5 | 2/2/01 | Letter Agreement between Ralph C. Taylor and Rolf Börjesson | |
| 6 | 2/8/01 | Letter from Dermot G. Coughlan to Rolf Börjesson | Hearsay, Foundation, Materiality, Authenticity |

| 7 | 3/8/01 | Letter from Rolf Börjesson to Dermot G. Coughlan | Hearsay, Materiality |
|---|---|---|---|
| 8 | 3/13/01 | Letter from Dermot G. Coughlan to Rolf Börjesson | Hearsay, Foundation, Materiality, Authenticity |
| 9 | 4/6/01 | Letter from Warren E. Buffett to Eugene M. Toombs | |
| 10 | 4/17/01 | Letter from Ralph C. Taylor to Rolf Börjesson | Hearsay, Foundation, Materiality, Authenticity |
| 11 | 4/23/01 | Letter from Ralph C. Taylor to David Gibson | Hearsay, Materiality, Foundation, Authenticity |
| 12 | 4/25/01 | Letter from Ralph C. Taylor to James Bernhard, Jr. | Hearsay, Materiality, Foundation, Authenticity |
| 13 | 4/27/01 | Letter from Rolf Börjesson to Ralph Taylor | Hearsay, Materiality, Foundation, Authenticity |
| 14 | 5/8/01 | Letter from Rolf Börjesson to Warren E. Buffett | Hearsay, Materiality, Foundation |
| 15 | 5/9/01 | Letter from Ralph C. Taylor to Robert Dove | Hearsay, Materiality, Foundation, Authenticity |
| 16 | 5/16/01 | Letter from Ralph C. Taylor to Ira Rennert | Hearsay, Materiality, Foundation, |

| | | | Authenticity |
|---|---|---|---|
| 17 | 5/16/01 | Letter from Ralph C. Taylor to Henry Kravis | Hearsay, Materiality, Foundation, Authenticity |
| 18 | 5/17/01 | Letter from Ralph C. Taylor to W. James Farrell | Hearsay, Materiality, Foundation, Authenticity |
| 19 | 5/17/01 | Letter from Ralph C. Taylor to Rolf Börjesson | Hearsay, Materiality, Foundation, Authenticity. Ambiguous |
| 20 | 5/22/01 | Letter from Ralph C. Taylor to Rolf Börjesson | Hearsay, Materiality, Foundation, Authenticity |
| 21 | 5/22/01 | Letter from Mike Tokarz to Ralph Taylor via facsimile | |
| 22 | 5/22/01 | Letter from Mike Tokarz to Ralph Taylor | |
| 23 | 5/23/01 | Letter from Ralph C. Taylor to Rolf Börjesson | Hearsay Materiality, Foundation |
| 24 | 5/24/01 | Letter from Ralph C. Taylor to Rolf Börjesson | Hearsay Materiality, Foundation |
| 25 | 4/27/01 | Letter from Rolf Börjesson to Ralph Taylor | Hearsay, Materiality, Foundation, Authenticity |
| 26 | 6/7/01 | Letter from Ralph C. Taylor to Rolf Börjesson | Hearsay, Materiality, Foundation, Authenticity |
| 27 | 10/11/00 | Letter from Ronald D. Flack to Rolf Börjesson | Hearsay, Materiality, Foundation, |

| | | | Authenticity |
|---|---|---|---|
| 28 | 11/14/00 - 5/8/01 | Taylor 5 notes re Rexam / Mitek deal | Hearsay Materiality, Foundation, Authenticity |
| 29 | 11/1/00 | Handwritten note from Dermot G. Coughlan (Bates labeled document plus darker copy) | Hearsay, Materiality, Foundation, Authenticity |
| 30 | | Handwritten notes (Bates labeled document plus darker copy) | Hearsay, Materiality, Foundation, Authenticity |
| 31 | 1/10/01 | Letter from Dermot G. Coughlan to Mark J. Schneider with facsimile coversheet and engagement letter | Incomplete Doc., Hearsay, Foundation, Materiality, Authenticity |
| 32 | 1/11/01 | Letter from Dermot G. Coughlan to Mark J. Schneider enclosing amended agreement | |
| 33 | 1/11/01 | Letter agreement between Ralph C. Taylor and Mark J. Schneider | Hearsay, Foundation, Materiality, Authenticity |
| 34 | 1/11/01 | Letter from Dermot G. Coughlan to Mark J. Schneider | |
| 35 | 1/16/01 | Letter from Mark J. Schneider to Dermot G. Coughlan enclosing signed copy of engagement letter | |
| 36 | 7/5/01 | Email from Bob Payne to Ralph Taylor and Dermot Coughlan re BCP fee agreement | |
| 37 | 7/5/01 | Facsimile cover sheet from Bob Payne to Dermot Coughlan enclosing the changes to the BCP engagement letter | |
| 38 | 7/5/01 | BCP engagement letter showing marked changes | Hearsay, Materiality |
| 39 | 1/16/01 | BCP engagement letter with handwritten changes | Hearsay, |

| | | | Materiality |
|---|---|---|---|
| 40 | 7/16/01 | BCP engagement letter showing marked changes | Hearsay, Foundation, Materiality, Authenticity |
| 41 | 7/23/01 | BCP engagement letter showing marked changes | Hearsay, Foundation, Materiality, Authenticity |
| 42 | 8/9/01 | BCP engagement letter showing marked changes | Hearsay, Foundation, Materiality, Authenticity |
| 43 | 8/24/01 | BCP engagement letter between Taylor Strategic Divestitures Ltd. and BCP | Hearsay, Materiality, Foundation, Authenticity |
| 44 | | Handwritten notes entitled "Borden Chemical" | Hearsay, Materiality, Foundation, Authenticity, Ambiguous |
| 45 | 9/10/01 | BCP engagement letter between Taylor Strategic Divestitures Ltd. and BCP (executed) | |
| 46 | 1/4/01 - 8/21/02 | Taylor 5 notes re: Borden deal | Hearsay, Materiality, Foundation, Authenticity |
| 47 | | Flow Chart for Taylor Strategic Divestiture -- Rexam/Mitek deal. | |
| 48 | | Flow Chart for Taylor Strategic Divestiture - Dow-Sentrachem deal. | |

Taylor Companies reserves the right to introduce additional exhibits (a) to the extent they have been identified above by the plaintiffs, but are not offered; and (b) as necessary at trial, including for purposes of impeachment and/or rebuttal of evidence offered by plaintiffs.

## XII.  DEPOSITION TESTIMONY

### A.  Plaintiffs:

The Plaintiffs hereby move to admit the following deposition transcript testimony into evidence, pursuant to Fed.R.Civ.P 32(a):

**Deposition of Ralph Taylor (March 17, 2005):**

| | | | | |
|---|---|---|---|---|
| p.6 | line 22 | to | p.7 | line 7 |
| p.9 | line 23 | to | p.19 | line 15 |
| p.31 | line 10 | to | p.38 | line 18 |
| p.40 | line 5 | to | p.46 | line 15 |
| p.55 | line 2 | to | p.61 | line 18 |
| p.67 | line 9 | to | p.93 | line 25 |
| p.95 | line 1 | to | p.103 | line 3 |
| p.107 | line 1 | to | p.111 | line 17 |
| p.112 | line 24 | to | p.113 | line 19 |
| p.114 | line 7 | to | p.124 | line 15 |
| p.127 | line 20 | to | p.129 | line 14 |
| p.131 | line 11 | to | p.142 | line 5 |
| p.145 | line 22 | to | p.156 | line 9 |

**Deposition of Dermot Coughlan (March 15, 2005):**

| | | | | |
|---|---|---|---|---|
| p.7 | line 1 | to | p.16 | line 10 |
| p.19 | line 21 | to | p.22 | line 24 |
| p.25 | line 11 | to | p.57 | line 14 |
| p.62 | line 15 | to | p.64 | line 7 |
| p.67 | line 1 | to | p.68 | line 22 |

**Deposition of Rolf Börjesson (June 14, 2005):**

| | | | | |
|---|---|---|---|---|
| p.14 | line 14 | to | | line 23 |
| p.15 | line 6 | to | | line 19 |
| p.17 | line 5 | to | p.18 | line 24 |
| p.23 | line 8 | to | p.28 | line 10 |

**Deposition of Mark J. Schneider (July 8, 2005):**

> p.1    to    p.30 (entire transcript)

**Deposition of Kenneth Griffin (March 16, 2005):**

| | | | | |
|---|---|---|---|---|
| p.11 | line 7 | to | line 10 | |
| p.14 | line 5 | to | p.23 | line 10 |
| p.24 | line 9 | to | p.30 | line 10 |
| p.41 | line 9 | to | p.70 | line 18 |
| p. 71 | line 8 | to | p.96 | line 9 |

**Deposition of Warren Bellis (March 16, 2005):**

| | | | | |
|---|---|---|---|---|
| p.12 | line 2 | to | line 12 | |
| p.20 | line 11 | to | p.22 | line 3 |
| p.26 | line 6 | to | p.28 | line 12 |
| p.29 | line 4 | to | p.32 | line 1 |
| p.33 | line 16 | to | line 22 | |
| p.47 | line 24 | to | p.51 | line 12 |
| p.52 | line 3 | to | p.53 | line 4 |
| p.54 | line 10 | to | p.56 | line 1 |

**Deposition of Ron Flack (March 14, 2005):**

| | | | | |
|---|---|---|---|---|
| p.6 | line 20 | to | p.7 | line 5 |
| p.12 | line 15 | to | p.13 | line 10 |
| p.26 | line 8 | to | p.29 | line 24 |

The Plaintiffs reserve the right to introduce the deposition testimony of Ralph Taylor and Dermot Coughlan for impeachment purposes at the time of trial, if necessary.

Taylor Companies' objections to Plaintiffs designation of deposition testimony is attached hereto at **Exhibit D.**

**B.    Defendants:**

The Defendants hereby move to admit the following deposition transcript

testimony into evidence, pursuant to Fed.R.Civ.P 32(a):

**1.    Deposition of Rolf Börjesson (June 14, 2005)**

| Page | Lines |
|------|-------|
| 6 | 19-25 |
| 7 | 1, 6-20 |
| 8 | 2-25 |
| 9 | 1-8, 13-25 |
| 10 | 1-2, 7-9 |
| 11 | 3-10, 13-25 |
| 12 | 1-4, 7-9, 17-19, 21-25 |
| 13 | 1-13, 24-25 |
| 14 | 1-12, 14-23 |

**2.    Deposition of Mark Schneider (July 8, 2005)**

| Page | Lines |
|------|-------|
| 4 | 5-25 |
| 5 | 1-25 |
| 6 | 1-25 |
| 7 | 1-25 |
| 8 | 1-25 |
| 9 | 1-10, 14-25 |
| 10 | 1-8, 10-24 |
| 11 | 3-17, 23-25 |
| 12 | 1-12, 18-25 |

| 13 | 1-25 |
|----|------|
| 14 | 1-10, 13-16, 19-25 |
| 15 | 1 |

**3.**    **Deposition of Myles Vincent Sinnott (July 8, 2005)**

| Page | Lines |
|------|-------|
| 4 | 4-23 |
| 5 | 2-25 |
| 6 | 1-22, 24-25 |
| 7 | 1-13, 16-25 |
| 8 | 1-25 |
| 9 | 1-12, 20-25 |
| 10 | 1-11 |
| 11 | 11-25 |
| 12 | 1-7 |

**4.**    **Deposition of Kenneth Griffin (March 16, 2005)**

| Page | Lines |
|------|-------|
| 9 | 9-17 |
| 10 | 13-24 |
| 11 | 5-8 |
| 12 | 20-25 |
| 13 | 1-10, 18-21 |
| 14 | 4-14, 24-25 |
| 15 | 1-12, 18-19, 23-25 |
| 16 | 1-10, 14-25 |
| 17 | 1-18 |
| 19 | 5-15 |

| 22 | 8-18 |
|----|------|
| 23 | 25 |
| 24 | 1-3, 9-15, 23-24 |
| 25 | 2-17, 21-25 |
| 26 | 1-12 |
| 27 | 8-12, 22-25 |
| 28 | 1-8, 16-24 |
| 29 | 20-25 |
| 30 | 1-7, 11-25 |
| 31 | 1-6, 14-21 |
| 32 | 2-7, 11-15 |
| 33 | 4-14 |
| 34 | 13-16, 21-25 |
| 35 | 1-9 |
| 41 | 9-14, 18-25 |
| 42 | 1-13, 17-19, 21-25 |
| 43 | 1-21 |
| 44 | 1-9, 18-21 |
| 45 | 7-17 |
| 46 | 2-7, 11-12, 14-25 |
| 47 | 1-16, 25 |
| 48 | 1-25 |
| 49 | 4-15 |
| 55 | 3-10, 15-17, 22-25 |
| 56 | 1-25 |
| 57 | 1-3, 11-18. 24-25 |
| 58 | 1-5, 18-25 |
| 59 | 1-3, 11-17, 20-25 |
| 60 | 1, 4-6 |
| 63 | 1-25 |

| | |
|---|---|
| 64 | 1-17 |
| 65 | 22-25 |
| 66 | 1-7, 13-25 |
| 67 | 1-9, 11-17, 19-21 |
| 68 | 16-25 |
| 69 | 1-13 |
| 71 | 8-15 |
| 72 | 11-19, 22-25 |
| 73 | 1-9, 13-25 |
| 74 | 1 |
| 75 | 3-12, 14 |
| 76 | 9-11, 16-21 |
| 77 | 7-20, 25 |
| 78 | 1-3, 23-25 |
| 79 | 1-12, 18-25 |
| 80 | 1-21 |
| 81 | 1-22 |
| 82 | 9-10, 13-21, 25 |
| 83 | 1-9, 14-20 |
| 87 | 24-25 |
| 88 | 1-6, 22-25 |
| 89 | 1-14 |
| 91 | 20-25 |
| 92 | 1-10 |
| 93 | 14-19, 22-25 |
| 94 | 1-5, 11-25 |
| 95 | 1-3 |

Taylor Companies reserves the right to introduce the deposition testimony of Robert Payne for impeachment purposes if necessary.

Plaintiffs' objections to Taylor Companies' designation of deposition testimony is attached hereto at **Exhibit E.**

## XIII. <u>PROPOSED JURY INSTRUCTIONS</u>

In light of the fact that the parties were unsuccessful in their attempt to assemble a consolidated set of proposed jury instructions, the Plaintiffs' requests for jury instructions, followed by Defendants' objections, are attached hereto as **Exhibit F** and. the Defendants' requests for jury instructions, followed by plaintiffs' objections, are attached hereto as **Exhibit G.**

## XIV. <u>ANTICIPATED EVIDENTIARY PROBLEMS</u>

### A. **Plaintiffs**

1.      In light of the fact that the Plaintiffs did not receive Defendants' designation of deposition transcript testimony until March 6, 2008, the Plaintiffs hereby reserve their right to counterdesignate transcript testimony as soon as they are able to do so.

2.      The Plaintiffs object to the redundancy of the proposed testimony of the Defendants' witnesses.  Specifically, the testimony of the five employees of the Defendants' is the same.  In addition, the proposed testimony includes areas of irrelevancy (i.e., Payne's interaction with other Taylor Companies' personnel).

56

**B.     Defendants**

(a)     Taylor Companies will move to preclude the testimony of David Epstein, listed by Payne as a purported expert witness, on the following grounds:  (1) Payne did not disclose Mr. Epstein in a timely fashion in accordance with Fed.R.Civ.P. 26(a)(2) and (4), and in fact did not disclose Mr. Epstein as a purported expert until July 31, 2006 – more than a year after the June 21, 2005 deadline for expert disclosure and following the entry of judgment against Payne; and (2) Mr. Epstein's proffered testimony is irrelevant and not properly the subject of expert testimony.  Copies of Taylor Companies' Motion to Preclude Expert Witness Testimony, supporting Memorandum of Law and Affidavit (each dated March 10, 2008) are attached hereto as **Exhibit H.**

(b)     Taylor Companies will move to preclude the testimony of two of Payne's listed witnesses (Thomas Bohle and Eugene Toombs) as Payne did not identify these individuals in his initial disclosures pursuant to Fed.R.Civ.P. 26(a)(1), and during the course of discovery did not supplement his initial disclosures to identify these individuals as potential witnesses for Payne. Copies of Taylor Companies' Motion to Preclude Fact Witness Testimony, supporting Memorandum of Law and Affidavit (each dated March 10, 2008) are attached hereto as **Exhibit H.**

(c)     Taylor Companies will object to the introduction of evidence as to Payne's management of the Borden deal, as there is no dispute between the parties (1) that Payne in fact managed that deal, or (2) that Taylor Companies paid Payne the full 10% commission due under the parties' letter agreement for Payne's efforts in managing the Borden transaction.

## XV.    PROPOSED FINDINGS AND CONCLUSIONS

N/A.

## XVI.    TRIAL TIME

Plaintiff estimates that its case in chief will require 3-4 days of trial time. Defendants

estimate that their defense can be completed within 1-2 days of trial time.

## XVII.    FURTHER PROCEEDINGS

No further proceedings are anticipated.

## XVIII. ELECTION FOR TRIAL BY MAGISTRATE

The parties have not agreed to have this matter tried by a Magistrate Judge.

THE PLAINTIFFS,                          THE DEFENDANTS,
ROBERT PAYNE AND PAYNE                   TAYLOR VISION RESOURCES,
INVESTMENTS, LLC                         TAYLOR STRATEGIC ACQUISITIONS,
                                         TAYLOR STRATEGIC DIVESTITURES,
                                         AND TAYLOR FINANCIAL SERVICES
                                         LLCTAYLOR COMPANIES, INC.


By: /s/ Michael P. Berman                By: /s/ Douglas J. Varga
    Michael P. Berman (ct05624)              Douglas J. Varga (ct18885)
    Kevin W. Gillen (ct01502)                Sarah W. Poston (ct19702)

    BERMAN AND SABLE LLC                     ZELDES, NEEDLE & COOPER, P.C.
    One Financial Plaza                      1000 Lafayette Boulevard
    Hartford, CT 06103                       Bridgeport, CT 06601-1740
    Telephone: (860) 527-9699                Telephone: (203) 333-9441
    Facsimile:  (860) 527-9077               Facsimile:  (203) 333-1489
    E-Mail: mberman@bermansable.com          E-Mail: dvarga@znclaw.com
    Their Attorneys                          Their Attorneys

**CERTIFICATION**

This is to certify that a copy of the foregoing has been sent via United States Mail,

postage prepaid, on this date, to:

> Michael P. Berman, Esq.
> Kevin W. Gillen, Esq.
> Berman and Sable LLC
> One Financial Plaza
> Hartford, CT 06103
>
> Jacob A. Stein, Esq.
> Stein, Mitchell & Mezines
> 1100 Connecticut Avenue, N.W. 11[th] Floor
> Washington, DC 20036

Dated at Bridgeport, Connecticut this 11th day of March, 2008

Douglas J. Varga

114