**EXHIBIT C – PLAINITFFS' PROPOSED EXPERT WITNESS REPORT**

# Report of
# David B. Epstein
# of Bentley Associates L.P.
(March 7, 2006)

In regards to:

*Robert Payne et. al. v. Taylor Vision Resources*

Report of
David B. Epstein
**Of Bentley Associates L.P.**
(March 7, 2006)

In regards to:

*Robert Payne et. al. v. Taylor Vision Resources*

**Engagement:**

David B. Epstein, of Bentley Associates L.P. was engaged by Gilbride, Tusa, Last & Spellane LLC to render an independent opinion based upon industry standards in the litigation entitled Robert Payne et. al. v. Taylor Vision Resources, in U.S. District Court, District of Connecticut, Index No. 202 CV 2234 ("Litigation") to assist in determining the fair and reasonable compensation due to Robert Payne and Payne Investments, LLC (together "Payne") for Payne's services provided to Taylor Vision Resources ("Taylor") pursuant to the employment agreement between Taylor Companies and Robert Payne dated November 20, 1999 (the "Agreement").

A copy of my engagement letter is attached as Exhibit A.

**Personal Background and Experience**

I have been involved in the financial services industry for over 28 years. During that entire period, my work has been in the area of corporate finance with specific focus on mergers and acquisitions, private placement of debt and equity securities and various other financial advisory services, including valuations and fairness opinions. I have extensive experience in arranging fee agreements with clients, providing investment banking services and advising clients in arranging purchase or sale transactions.

I graduated from Brown University in 1974 with a bachelor's degree in Economics and International Relations. I received an MBA, with concentrations in finance and accounting, from Columbia University Graduate School of Business in 1977. In June 1977, I joined the Corporate Finance Department of the Merchant Banking Group in Citicorp. From 1977 to 1980, I worked in several different areas of the corporate finance and project finance departments. Between 1981 and 1991 I worked in the Mergers and Acquisitions Department. During my time in the M&A Department, I was extensively involved in building our global capabilities and worked extensively on cross-border transactions. In 1991, I co-founded Bentley Associates L.P. and Bentley Securities Corp., an investment banking firm where I am currently a Managing Director. My work at Bentley encompasses many different facets of corporate financial advisory services including mergers and acquisitions, private placement of securities, valuations, fairness opinions,

1

litigation support services and other financial advisory services. In 1999, I was engaged to render an independent opinion in the litigation entitled *Mina Investment Holdings Ltd. v. Lefkowitz, No. 97 Civ. 1321 (S.D.N.Y.)*. In 2003, I was engaged to render an independent opinion in the litigation entitled *Gruppo, Levey & Co. & GLC Securities Corp. v. ICOM Information & Communications, Inc. Index No. 01 CV 8922 (S.D.N.Y.)*.

In addition to my current work in investment banking, I have also served as an Adjunct Professor at Rider University, The College of New Jersey and Rowan University. Beginning in the fall of 2001, I taught at one or more of these schools in each of the next eight fall and spring semesters, teaching courses in Microeconomics, Macroeconomics and Money and Banking.

A copy of my resume is attached as Exhibit B.

**Summary of Information Reviewed and Facts Considered:**

In arriving at my opinion, I reviewed the following information in this Litigation: Contract Agreement dated November 20, 1999; Summons dated December 18, 2002; Complaint dated December 13, 2002; Answer to Complaint and Affirmative Defenses dated November 21, 2003; Report of Parties Planning Meeting dated February 24, 2004; deposition transcripts of Ralph Taylor, Ron Flack, Kenneth Griffin, Rolf Borjesson; letter to Jacob Stein, Esq., Stein Mitchell & Menzies, LLC, dated March 25, 2002I; letter to Jacob Stein, Esq., Stein Mitchell & Menzies, LLC, dated April 23, 2002; letter to James Donohue, Esq., Gilbride, Tusa, Last & Spellane LLC, dated May 8, 2002; letter to Jacob Stein, Stein, Mitchell & Menzies, LLC, dated May 10, 2002; Taylor Strategic Divestiture document (marked Exhibit 1, 3-19-05); deposition transcripts of Mark Schneider, Robert Payne.

The following are some of the key facts concerning Robert Payne's employment by Taylor and Robert Payne's work while at Taylor, as disclosed in the documents reviewed:

1. Robert Payne was engaged by Taylor pursuant to an offer contained in a letter from Taylor to Payne dated November 20, 1999 the main terms of which are summarized as follows:

    (a) Commissions of 10.0% to be paid on "net revenues" from contracts on which Payne "manage[d] the transaction or project".

    (b) Additional 5.0% commission ("Additional Commission") to be paid on "net revenues" from contracts on which Payne took "responsibility for leading the marketing efforts which Taylor has not served prior to [Payne's] employment". "Contract closure should be completed without the assistance of any executive level Taylor personnel. In those instances in which another Taylor executive directly assists in contract closure, the aforementioned percentage will be reduced to 2.5%."

2

    (c)    A bonus commission ("Bonus Commission") of 5% (or 2.5%) (the exact percentage amount determined on the same basis as noted in paragraph (b) above) on the first $1,500,000 "net revenues" generated from Payne leading the marketing efforts. This bonus is in addition to the Additional Commission and is to compensate Payne for forfeiting a $75,000 bonus from his present employer.

    (d)    An annual draw of $125,000 against commissions.

    (e)    "Once Commissions earned exceed the annual base draw in any calendar year, commissions due will be paid monthly. There will be no true-up or carryover of annual short fall from draws advanced..."

    (f)    In addition to the above money compensation items, the engagement letter provided for Taylor to (i) provide a laptop computer and assume various telecommunication expenses, (ii) pay medical, dental and life insurance premiums after 30 days employment, (iii) allow Payne to participate in Taylor companies 401(k) plan with a matching 25% of contributions up to statutory limits, and (iv) three (3) weeks paid vacation during the first year of employment.

2. There are three projects (engagements/transactions) on which Payne worked while employed by Taylor which are material to this litigation. They are: (i) Mitek; (ii) Borden Chemical and (iii) Dow Chemical Sentrachem.

3. Taylor received fees for each of the three engagements/transactions named in item 2 above.

4. Payne disengaged from Taylor in or about December 2002 because, despite repeated requests for compensation pursuant to his employment agreement for his work at Taylor, he only received his draw. Prior to Payne's disengagement from Taylor, there were no reviews or letters indicating that Payne was not performing pursuant to his employment agreement while working at Taylor.

5. Payne engaged the services of Gilbride, Tusa, Last & Spellane on or about March 21, 2002, in order to try to recover, from Taylor, compensation owed to him pursuant to his employment agreement.

6. On March 25, 2002, Gilbride Tusa, Last & Spellane wrote the first letter to Taylor's legal counsel on behalf of Payne requesting Payne's full compensation pursuant to his employment agreement.

7. The first written response to Payne's claims for compensation and other remuneration pursuant to his employment agreement pursuant to the letter of March 25, noted in 6. above, is articulated in a letter from Stein, Mitchell & Menzies dated April 5, 2002 in which Payne's claims with regard to the Mitek and DowChemical Sentrachem engagements/transactions are claimed to be "misplaced". There is no reference to the

       Borden Chemical engagement/transaction. This letter also denies Payne's other claims including (a) bonus commission, (b) reimbursement for benefits and (c) laptop computer.

8. On May 8, 2002, following further correspondence from Gilbride, Tusa, Last & Spellane, Payne received some additional money from Taylor for compensation claimed pursuant to Payne's employment agreement. This payment related to Borden 1 and Borden 2.

9. On or about October 7, 2002 Payne received additional money from Taylor toward his Bonus Compensation.

10. On or about December 30, 2002 Payne received additional money from Taylor relating to Borden.

**General Overview of a Managing Director and Related Compensation:**

1. General Definition:

       A Managing Director is a senior individual, The term "Managing Director" was the traditional term for "the top executive" in the United Kingdom and other English speaking countries (other than the United States). Over time, many US businesses adopted the term Managing Director. More modern definitions of the title, as found in some dictionaries are: (1) "A person who manages a business though not the owner or chief executive." and (2) "someone who controls resources and expenditures."

       These definitions typically apply to manufacturing firms, not service based businesses. Service businesses, whether in banking, investment banking, advertising or other similar types of businesses are traditionally staffed with more senior individuals relative to the total number of employees than one would find, for example, in manufacturing firms. Because in service businesses, client service requires the attention of many more senior people than in a manufacturing business, service firms tend to have many more people with senior titles. For example, commercial banks have traditionally been staffed with many more vice presidents than one would find in a manufacturing business. Thus, the meaning of the title varies depending upon the type of organization in which it is being used. Burston-Marsteller, a leading PR firm defines the role of a Managing Director as follows: "A Managing Director contributes to the overall performance of the firm by managing current client relationships and programs, generating new business, recruiting, developing and growing staff".

       The title Managing Director can convey the fact that the person has senior management responsibilities, more consistent with the traditional definition as used in manufacturing companies and/or the title is used to signal to clients that the person is a senior individual on par with other Managing Directors at other similar firms. When used primarily for external purposes, there may be little or no management responsibilities associated with the title.

4

Within the investment banking community, including both large full service firms and smaller "boutique" firms, the title Managing Director is used both for external and internal purposes interchangeably. Sometimes, when an individual is also a department head or in a clear management role, there is an additional functional title, such as "Department Head", which is used in addition to the title Managing Director. When the title is used primarily for external purposes, to convey to the client that the individual is a senior person, the title conveys that the person has attained a certain level of experience that qualifies the person for the title. Typically, in investment banking, one gains the necessary level of experience by working on many different types of projects. One learns all the necessary steps involved from the initial marketing through completion of the project, whether it be concluded with a report or the closing of a transaction. However, just because one has gained the experience and knowledge of all these different steps, this does not mean that the Managing Director is either responsible personally or in terms of oversight for all the different steps involved. A clear example would be a "new business" group within an investment bank. Many large investment banks have a team of individuals whose sole responsibility is to develop new business. Some of these individuals might have the title of Managing Director. Merely having the title, Managing Director, however, does not change the fact that functionally these individuals are tasked with simply developing the new business and then turning it over to others to process. Likewise, some of the persons who are involved in the processing of the business might have a Managing Director title but little or no responsibility for marketing any business.

2.  Compensation of Managing Directors in Investment Banking Firms:

Compensation on "Wall Street" has historically been primarily bonus driven. Thus the predominant factor that affects the level of one's salary is the success of the firm. This factor will set the level of bonuses for all employees. The factor which has traditionally been the most important in determining how a bonus is distributed in a firm is the amount of revenue (fees) earned by the firm on work performed by the individual managing director.

In smaller "boutique" firms, such as Taylor, one might reasonably find that compensation would typically be even more linked to the fees generated by an individual than might be the case at a larger firm where there might be other factors, such as development of junior staff, and other administrative matters.

It is also typical on Wall Street that when a person moves from one firm to another, there is a contract that provides for a guaranteed level of compensation for a period of time. Such a guarantee is common in order to provide some assurance that during a transition period into a new firm with a different group of people and perhaps a different method of determining compensation that the individual would receive a certain guaranteed minimum compensation. This guarantee also is provided because there is typically a period of transition where the individual might not be as productive due to the fact that it takes time to develop new business.

In addition, it is typical in larger firms that there are formal performance reviews and documentation of performance in order to minimize problems of subjectivity and misunderstanding when bonuses are distributed. Thus, one might require a contract when one moves from one firm to another as a method to minimize the subjectivity in the review process.

In a smaller firm, where compensation may be determined by one individual, the concern of subjectivity is much greater and thus the use of a contract is much more common. Accordingly, a managing director with an employment contract which specifies an agreed compensation or compensation package (which may include percentages of fees earned from projects on which the managing director worked) will be compensated pursuant to the contract. The type of project or how the fees were earned on the project would not affect the compensation of the Managing Director unless specifically detailed in the employment agreement.

**Review of Robert Payne's Agreement:**

While there are no standard forms of contracts used, Payne's Agreement appears to be the type of contract that one would see for the hiring of a person at a senior level such as a Managing Director. While the percentages may vary and some of the particulars of the job description may vary, in general, the concept of a base and bonus or draw against commission is rather standard practice in the industry. In addition, the concept of an incentive or additional compensation for lead generation above and beyond production is also standard, although it might be more common in regard to employment by smaller firms rather than larger firms. Another provision that is very standard in the industry is a provision to "make-up" for one's lost bonus from the firm the individual is leaving. Such a provision is more typically presented as a guaranteed amount rather than an additional bonus incentive. Finally, one other provision that is oftentimes found in contracts such as this one, but is not in Payne's Agreement, is a termination clause.

**Review of Some Issues in this Litigation as Relates to Payne's Agreement:**

1.  Acquisitions vs. Divestitures:

A question has been raised as to whether one would expect a contract such as Payne's Agreement to apply to both acquisitions as well as divestitures. The answer is yes it would. While there might be a distinction made between mergers and acquisitions vs. financing or some other aspect of investment banking work, it would be highly unusual for there to be any distinction between or among the different types of merger and acquisition work. The reason for this is that oftentimes discussions about either (i) an acquisition or (ii) a divestiture/for-sale transaction might lead to a transaction involving the other. Since most firms are simply interested in maximizing the fees earned and not trying to pigeon hole individuals so that there is a disincentive to produce fees, then in most instances the commissions would apply to all fees earned regardless of the structure of the transaction which generated the fees.

If there were a distinction between M&A and financing, that would be to clarify the functional position for which the individual is being hired. However, if there were a clause providing for additional commission for fees generated from leads introduced to the firm then such a provision would apply to all leads introduced not just those in one functional area vs. another.

2. Role of a Managing Director and other Issues Relating to the Mitek Engagement:

   A. What would be the duties of a Managing Director in this transaction?

   A Managing Director is one who brings senior experience to a project and typically has the authority to make decisions and interact with the client without further supervision. The Managing Director is usually the one who is focused on the overall aspects of the assignment.

   A Managing Director may or may not work alone on a given engagement/transaction. It is hard to state, and that is why it is rarely done, which part of the process of an engagement (from initial client retention to completing the assignment) is the most important. Sometimes, a single Managing Director manages the entire process other times (and this is more frequently the case) there are a number of individuals involved. The team approach, which is more common, assures that if one person is unavailable due to the press of other business, or ill health, then another team member will fill-in. In addition, the team approach recognizes that different individuals have different strengths, some may be better at interacting with the client while others are better at managing the process. Unless the Managing Director is working alone, then normally a good Managing Director would use whatever resources are available in order to complete the assignment successfully and earn fees for the firm. The coordination of the full resources of a firm is the mark of a good Managing Director. It helps to ensure success on the project, good client relations and good training of support staff.

   Based upon the information reviewed, the fact that others were involved in the Mitek transaction, at different stages, does not appear to change Payne's status as a Managing Director with Taylor or for the Mitek transaction.

   B. What is the impact of an unsolicited offer and would it affect a Managing Director's compensation?

   In the course of selling a business, sometimes an unsolicited offer, that is an offer to purchase the target company, is made by someone or some company that was not approached by the seller or the seller's advisor.

   In the course of selling a business, the key objective is to find a buyer and close the transaction. If the seller retains an advisor, the advisor's duties are detailed in an engagement letter. Amongst others, the advisor is usually tasked with identifying and approaching potential buyers with the approval of the seller. Sometimes, the seller has already had discussions with one or more potential

7

buyers prior to the engagement of the advisor, sometimes the seller may want to contact some of the potential buyers directly and still other times the seller or the seller's advisor may receive an offer from a buyer that was unsolicited.

Regardless of how a potential buyer makes an offer, solicited by the advisor, solicited by the seller directly or unsolicited, the offer is typically incorporated into the process being managed by the advisor. Frequently, engagement letters provide that if the client receives inquiries or offers directly, then they are to be conveyed to the advisor. Depending on where in the process the offer arrives, it may or may not have a material effect on the amount of work being undertaken by the advisor. For example, if the unsolicited offer arrives at the beginning of the process, the advisor may still need to conduct the normal process to put that offer in context or if the offer arrives toward the end of the process, then the majority of the contacting work has already been done. Thus, the presence of an unsolicited offer in and of itself does not indicate whether it has changed the amount of work undertaken by the advisor. Even if the presence of the unsolicited offer had reduced the amount of work, compensation in the investment banking industry for Managing Directors for merger and acquisition advisory work is not normally determined based upon hours or effort. Compensation is almost always based solely upon how much money was generated (fees earned), regardless of the effort. Thus, if one could generate more money with less effort, theoretically one should be compensated even more.

Based upon the information reviewed, Mitek paid a fee (apparently the full fee) to Taylor pursuant to an engagement letter, even though the transaction was completed with a buyer that was solicited by the seller directly. Unless specifically detailed in the engagement letter to the contrary, the normal fee engagement letter with a client would have required the client to pay the full fee regardless of whether the offer was solicited by the advisor or not. Thus, once Taylor received the fee, the fact that the transaction closed with a buyer who made an unsolicited offer would normally be of no consequence. On Wall Street, this transaction would be viewed as a huge success by the firm and the individuals who worked on it. Accordingly, the Managing Director, like all employees who worked on the transaction should receive their normal compensation based upon the fees received.

C. What is typically the process involved when a complaint arises?

The first thing that an investment bank, or any organization for that matter, tries to do is to make sure that its customers have a positive experience and that the customers will use the firm's services, or buy its products, again. Thus, if there is a complaint from a client/customer, it would seem logical that the firm would look into the complaint and take steps to make sure that the problem is resolved. And in fact, this is exactly what typically happens. If the complaint emanates

8

from a client concerning a certain individual working with the client, then the firm might try to accommodate the client by reassigning the individual to other projects or other clients. If the complaint arose from within the firm from amongst team members working on a project, then normally the most senior person involved would investigate the matter by speaking to the team members or even the client to determine what the issue is and whether it is affecting the client relationship. The one thing that is not reasonable and most likely would never occur is that a complaint (alleging that the client was upset or concerned about something) would arise and no one (not even the client) would know about it. Even if there were reasons for not discussing a complaint in the heat of a transaction, it most certainly have been discussed or documented immediately after the transaction closed.

Sometimes there are issues that arise during the course of an engagement that might seem like a problem, but in hindsight when the transaction closes and if the client is satisfied with the work, then what may have seemed like a potential problem might be dismissed. Most firms conduct annual or year-end reviews and document the performance of all individuals within the firm. This is done so that there will be a written record of any complaints or issues. While any major issue would most likely be documented in a contemporaneous manner, the year-end or annual review would also detail the issue. If there were no documentation as to any issue then it is reasonable to assume that there were no issues or complaints that rose to the level of being mentioned or affecting a person's performance review.

Based upon the information reviewed, it appears that the only mention of a complaint or concern about Mr. Payne's performance arose when Mr. Payne tried to collect the commissions due pursuant to his employment contract. There does not appear to be any record or documentation of any complaint concerning Mr. Payne's performance prior to those mentioned after Mr. Payne's formal request for monies due. If the complaints were of a nature that it would affect Mr. Payne's compensation or employment, one would have expected to have seen evidence of such complaints or concerns by way of communication to Mr. Payne or other documentation in some file maintained about him with those in charge.

3.    Issue Related to the Borden Engagement:

Payne's Agreement provides for an extra 5% commission from contracts "which [Payne] take[s] responsibility for leading the marketing efforts with companies which Taylor has not served prior to [Payne's] employment" and "Contract closure should be completed without the assistance of any executive level Taylor personnel." The Agreement continues by stating that if another Taylor executive "directly assists in contract closure" the extra commission would be 2.5% not 5%.

9

It is not uncommon to have a provision for an extra commission for generating a lead or introducing a new client. The main purpose of this type of language is to recognize and reward the person (in this case Payne) for introducing a new client (in this case Borden) to the firm (in this case Taylor). Rarely does a person (including a Managing Director) in an investment bank, including a small firm such as Taylor, solicit and receive a signed engagement letter (contract closure) solely by oneself without the involvement of one or more persons within the firm. Thus, it is more common to recognize this fact by rewarding the person for introducing the idea or the client whether or not others have been involved in the marketing effort.

Based upon the information reviewed, (including the Affidavit and Deposition of Mr. Mark Schneider, (Borden's CEO) it is clear that in this situation, Payne did introduce to Taylor a company (Borden) with whom Taylor had not done any previous work and Payne managed the process of getting Borden to engage Taylor for an M&A advisory assignment. Payne, as the Managing Director at Taylor, marketing to a company and management at that company well known to Payne, could clearly arrange contract closure without the assistance of any executive level personnel at Taylor. Although Mr. Schneider, in his deposition, stated that 20% of his contacts with Taylor during the negotiation or the engagement agreement were with Dermott Coughlin, it appears from Schneider's deposition that these contacts were more directed at establishing a strong client relationship, rather than Coughlin in any way directly assisting in contract closure. The involvement of Mr. Coughlin in the process of marketing to Borden is consistent with normal industry practice of introducing others to develop a broader client relationship within the firm. Therefore, since it does not appear that "direct assistance in contract closure" was needed or was involved in this situation, Payne should be entitled to the entire 5% additional commission on the Borden transaction.

4.     Issue relating to the Dow Sentrachem Engagement:

The issue of dispute relating to this transaction appears to be (a) if a Managing Director and the employer had a dispute involving compensation, would the Managing Director be justified in declining to continue work, (b) if the Managing Director stops working for an employer and stops working on a transaction in progress, what is the normal and customary procedure in compensating that Managing Director and (c) would the answer to the question posed in (b) above be affected if the reason for the Managing Director declining to continue to work was for cause.

Managing Directors move from one firm to another all the time in the investment banking industry. Typically, when one leaves a firm voluntarily, one leaves behind any residual compensation that might have arisen from projects on which the Managing Director was actively working. An exception to this would be in the case where the Managing Director and the employer specifically make arrangements that are different. Especially in smaller firms or where the person leaving is not pursuing competing employment, then one might see an exception so that the project or transaction can be successfully concluded.

If a Managing Director stops working on a transaction for compelling reasons, the question is what are those reasons and how would this situation be handled. If an individual Managing Director has serious and justifiable compelling reasons to cease to work on a transaction based upon the actions of his firm, and the transaction closes, what if any compensation is due to the Managing Director who disengaged from the project.

This is not a normal occurrence and thus, there are no industry standards or norms that might apply. The key issue in resolving this matter, it would appear, would be the question of whether the Managing Director's actions were based on cause or not. If the actions were for cause, similar to an employer terminating an employee for cause, then it would appear that the Managing Director's actions were not unreasonable. Thus, if the Managing Director's actions were for cause, it would seem logical that the Managing Director should be compensated.

Based upon the information reviewed, it is clear that Payne believed that Taylor had abrogated its compensation agreement with him pertaining to the Mitek transaction. Mr. Payne then acted in a fashion that appears reasonable under the circumstances. Payne informed Taylor that unless the compensation matter were resolved, it would be necessary for Payne to terminate his work on the Dow/Sentrachem transaction.

Since Taylor did not compensate Payne for the Mitek transaction, Payne concluded his work on the Dow/Sentrachem transaction following two trips to visit the client in South Africa and after having initiated the sale effort. Payne then handed off the transaction to his subordinate at the time, Ken Griffen, and thus there was no interruption to the client and the transaction was completed successfully.

Because Payne's actions were based upon the failure of Taylor to resolve the Mitek compensation matter, and Taylor's unilateral breach of Payne's Agreement with Taylor, Payne appears to have good cause for his actions. It should also be noted that even though Taylor abrogated the Agreement and denied Payne compensation owed, Payne acted as a professional when, in the process of disengaging himself from Taylor, he made sure that there was no interruption in the processing of the assignment. Accordingly, it appears that Payne should be entitled to his contractual compensation for the Dow/Sentrachem transaction.

### Summary and Conclusion:

A Managing Director in the investment banking industry is considered to be a senior person with many years of experience. A Managing Director is typically compensated in a fashion which is largely tied to the fees earned by the firm and more specifically the contributions (fees generated) by the specific Managing Director. The focus in the investment banking industry is on generating fees which for most transactions are related to the size of the transaction not the hours worked. Thus, compensation of a Managing Director is most typically tied to the amount of the fees earned and not the hours worked. If there were some other basis for determining compensation, such as hours worked, developing junior staff, or other management responsibilities, these would most typically be detailed to the Managing Director at

11

the outset and not announced with the awarding of a bonus. Finally, Managing Directors typically work as part of a team, the focus of the team being to generate business for the firm. As a senior member of the team, the Managing Director is primarily focused on the overall process and making sure that the project proceeds smoothly. At times, this means relying on others to assist in order to move the process forward. A good Managing Director will know what resources are available and when to use the appropriate resource in order to get the job done.

Employment contracts are common in the investment banking industry. Not that all persons have employment contracts all the time, but rather they are used at certain times or by certain firms with some degree of regularity. When a Managing Director moves from one firm to another, there is typically an employment contract. An employment contract is designed to clarify the terms upon which employment and compensation are or will be based. It is usually designed to minimize confusion or disputes as to responsibilities or compensation. In return for binding the firm to live up to its commitment as specified in the contract, the firm usually has a clause providing for termination under certain circumstances (cause for example). This agreement thus gives the employee some degree of comfort that in return for his/her efforts undertaken on behalf of the firm, then the employee will be justly compensated according to the contract. (An analogy might be the contract (engagement agreement) between the firm and the client. If the transaction closes pursuant to the terms of the engagement agreement, the client pays the firm a fee as previously determined. The main reason in investment banking why firms obtain a signed engagement letter at the outset of a transaction is to avoid problems which might arise at a later stage when the client, having successfully concluded a transaction, might have no further need of the advisor and thus tries to reduce or avoid paying any fee.)

Based upon the foregoing, Payne is entitled to his contractual compensation for the three transactions involved in this Litigation (Mitek, Borden, and Dow/Sentrachem). As per the Agreement between Payne and Taylor, Payne should be compensated the full commission (10% of the proceeds paid to Taylor) for each of the three transactions noted above plus a full additional commission (5% of the proceeds paid to Taylor) for the Borden transaction.

David B. Epstein
Managing Director
Bentley Associates L.P.

11/14/2005 09:56 FAX 12126616328    GILBRIDE, TUSA NY    ☐001/002
Nov 14 05 08:59a    Bob Payne    203-431-8579    p.2

# BENTLEY ASSOCIATES L.P.
101 Park Avenue
22nd Floor
New York, New York 10178
www.bentleylp.com

Tel: 212-972-8700
Fax: 212-972-1820

November 12, 2005

Gilbride, Tusa, Last & Spellane LLC
Attorneys at Law
708 Third Avenue
New York, NY   10017

Attn: James P. Donahue, Jr.

Gentlemen:

    I am writing to confirm the terms of my and my firm's retention to provide consulting services to your firm in connection with your representation of Robert Payne in the litigation Robert Payne et. al. v. Taylor Vision Resources (the "Litigation").

    The services to be performed pursuant to this engagement may include research, the preparation of affidavits, expert reports, attending at and giving deposition and trial testimony and assisting your firm in connection with trial preparation.

    In that connection, I will review the appropriate evidence, documentation and information regarding this transactional dispute and perform such other research and analysis necessary for the purposes of this engagement. I will be prepared to provide timely affidavits and reports as you may request concerning matters relevant to compensation standards utilized in the securities industry, particularly the field of acquisitions and divestitures, which is the subject matter of the Litigation. I will be available for oral testimony at any pre-trial deposition and in court if you and Robert Payne decide to have me serve as an expert witness at trial.

    The fee for this assignment will be based on the time that it requires for appropriate preparation and production of any reports and oral testimony. My time devoted to research, analysis, preparation of affidavits and reports and preparation for testimony will be charged at the rate of $550 per hour. My time spent in providing oral testimony and in participating in depositions and court proceedings will be charged at

Bentley Securities Corporation, an affiliated company, is a registered broker-dealer
and a member of the National Association of Securities Dealers (N.A.S.D.)

Gilbride, Tusa, Last & Spellane LLC
November 12, 2005
Page 2

$550 per hour. I will also be reimbursed for any necessary direct out-of-pocket expenses reasonably incurred in connection with this assignment, as well as $275 per hour for direct travel time for any trips outside New York City. Monthly statements shall be prepared detailing my work during that period. Upon exhaustion of the initial retainer, payment for services and expenses shall be made promptly upon submission of a written bill to Robert Payne to your attention. An initial, non-refundable retainer fee of $10,000 is payable upon the execution of this engagement.

The terms of this engagement shall be deemed privileged and confidential and shall not be disclosed to any third party without your and Robert Payne's written consent. The documents and information provided to us shall also be treated as confidential and shall not be disclosed to any third party without your and Robert Payne's written consent, except as may be necessary to perform the services and obligations required hereunder. We shall observe any other confidentiality requirements usual and customary and reasonably requested of us with regard to attorney work product, proprietary or privileged information or as directed by Court order.

If this letter accurately states the agreement between us, please so indicate by signing two copies of this letter and returning one copy to David B. Epstein.

Sincerely,

BENTLEY ASSOCIATES L.P.

By: _____
David B. Epstein
Managing Director

Agreed and Accepted
as of the Above Date

GILBRIDE, TUSA, LAST & SPELLANE LLC
As Attorneys for Robert Payne

By: _____
James P. Donahue, Jr.

DBE:pr

**DAVID B. EPSTEIN**
c/o Bentley Associates L.P.
101 Park Avenue, 18th Floor
New York, NY   10178

**EXPERIENCE**

| | |
|---|---|
| 2001/2002<br>2002/2003<br>2003/2004<br>2004/2005<br>Academic Years | **Adjunct Teaching**<br>Rider University, Lawrenceville, NJ, Principles of Microeconomics.<br>Rowan University, Glassboro, NJ,  Introduction to Economics, Micro.<br>    Introduction to Economics, Macro.<br>The College of New Jersey, Ewing, NJ, Money & Banking, Intro. Micro. |
| 4/91 - Present | **BENTLEY ASSOCIATES L.P., New York, NY**<br>Managing Director.  Co-Founded this investment banking boutique. Services include Mergers & Acquisitions, Private Placement Debt and Equity Financing and Financial Advisory.  Focus on Middle Market Companies, expertise with family owned businesses.<br><br>Projects include: For-Sale Assignments, Venture Equity and Growth Capital Fund Raising, Valuations and Expert Witness Assignments |
| 6/77 - 4/91 | **CITICORP, New York, NY**<br><u>1981-1991</u>:  Vice President, Mergers and Acquisitions Department. Responsible for marketing and processing transactions in a variety of industries.  Particular focus on:  Retailing, Manufacturing, Insurance, Construction and Engineering.<br><br>• Significant cross-border expertise.  Transaction experience included: Exclusive-for-sales, Divestitures, Acquisition Advisory and Searches, LBOs, ESOPs and Financings.  Clients ranged from Fortune 100 to smaller privately owned family businesses.<br><br>• Key person in building a global M&A Department, including: created policies and procedures for coordinating global network, established global M&A conferences and status reports, created marketing brochures.<br><br>• Instrumental in building U.S. Corporate Finance Department including: built first New Business Group, developed internal training programs.<br><br><u>1977-1980:</u>  Associate.  Rotating assignments in:  Private Placement, Project Finance, Currency Swaps, Eurosecurities, Financial Planning and New Business Development Departments. |

David B. Epstein                                                                                             Page Two


**EDUCATION**

May, 1977          **COLUMBIA UNIVERSITY - GRADUATE SCHOOL OF BUSINESS**
                   MBA; Concentrations in Finance and Accounting.
                   Activities:   American Finance Association, member; Management Consultants, Inc., consultant; Columbia Journal of World Business, editorial staff

                   **PRATT INSTITUTE**
                   Instructor 1976-1977 (While attending Columbia)
                   Hired to teach three courses: Introduction to Management, Accounting, Small Business Management. Created syllabus, selected texts, taught course and prepared exams.

May, 1974          **BROWN UNIVERSITY**
                   Bachelor of Arts Degree
                   Majors:      Economics; International Relations
                   Activities:  Brown Broadcasting Services, Inc., WBRU (FM)
                                - Station Manager of commercially licensed 50,000 Watt FM Radio Station.
                                - Assistant News Director and Public Affairs Director.

**ORGANIZATIONS**

              Brown University Associations:
                     Brown Annual Fund/Development (Former Vice Chair)
                     Brown Club, New York (Former Director)
              Princeton Club, New York
              Council on Foreign Relations (Former Term Member)
              Lincoln Plaza Tenants Corp. (Residential Co-op, NYC)
                     Director, Treasurer (Former President)
              Blue Hill Troupe, Ltd.
                     (Charity Theatre Group -- Gilbert & Sullivan)
              The Society of Friends of Touro Synagogue (Trustee)