# Exhibit A

PAYNE v. TAYLOR VISION                                    May 13, 2005

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

No. 3:02 CV 2234 (AWT)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ROBERT PAYNE and PAYNE INVESTMENTS, LLC,

       Plaintiffs,

       Vs

TAYLOR VISION RESOURCES,
TAYLOR STRATEGIC ACQUISITIONS,
TAYLOR STRATEGIC DIVESTITURES,
and TAYLOR FINANCIAL SERVICES,
LLC, all defendants collectively
operating under the name TAYLOR COMPANIES,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


      The Continued Deposition of ROBERT PAYNE, taken

Pursuant to Notice, on behalf of the Defendants, in the

hereinbefore entitled action, before Francine Garb, a

Certified Shorthand Reporter and Notary Public within

and for the State of Connecticut, commencing at

10:15 a.m., on May 13, 2005, at the law offices of

Gilbride, Tusa, Last & Spellane, LLC, 31 Brookside

Drive, Greenwich, Connecticut.

PAYNE v. TAYLOR VISION                           May 13, 2005

Page 103

                         ROBERT PAYNE
1
2   performance of some of those tasks?

3        A    I did not.

4        Q    Are there any on Exhibit 12 that should be

5   denoted partial?

6        A    In the context of the earlier comment about

7   partial, not on the Dow transaction, but on the Borden

8   transaction where there were multiple parties always

9   doing that task vis-a-vis delegating, et cetera.  The

10  word "partial" does not apply on the Rexam transaction,

11  because partial in the Dow transaction is meant to say

12  I was finished, I was done with Taylor Companies, and

13  so I started the process, but did not finish it.  That

14  is what I mean by "partial."

15       Q    For Dow, your partial means you started the

16  process but did not complete it?

17       A    That is correct.

18       Q    However, on none of Exhibits 10, 11 or 12 did

19  you in any way indicate that while you were involved in

20  a particular task others also were involved in a

21  particular task?

22       A    That is correct.

23       Q    I would now ask you to indicate on Exhibits

24  10, 11 and 12, Mr. Payne, any task that you partially

25  performed and others partially performed, just with a

PAYNE v. TAYLOR VISION                                May 13, 2005

Page 104

                         ROBERT PAYNE
1
2    star next to your initials or some similar notation.
3           What I'm trying to get at here, Mr. Payne, I
4    just want to know which of these tasks that you have
5    initialled you performed solely, or you performed in
6    conjunction with others.
7           MR. DONOHUE:  Doug, I really --
8           THE WITNESS:  Can we talk?
9           MR. DONOHUE:  One second.  I understood when
10          we left the last deposition he might be called
11          back to look at a couple of documents that we were
12          going to produce.  It's now pretty clear to me
13          that Mr. Stein, who was at the deposition last
14          time, had this document, because we sent it to
15          him.  It's in the Notice of Claim.  Why are we
16          doing all of this?  This was not supposed to be a
17          second round of depositions of Mr. Payne.  You
18          don't want to produce your guys and me do the same
19          thing to them, do you?  This really is going over
20          the same ground.
21          MR. VARGA:  I disagree that it's going over
22          the same ground.  I would note that the prior
23          deposition of Mr. Payne lasted all of about two
24          hours.  All I'm trying to do at this point is to
25          just nail down the specific tasks that Mr. Payne

**PAYNE v. TAYLOR VISION**                              **May 13, 2005**

1                         ROBERT PAYNE

2     performed on three deals.  It's not going to take

3     an inordinate amount of time.  I assure you I'm

4     not plowing new ground, and I'm not asking

5     questions about it.  I wanted to initial them so

6     we all know exactly what Mr. Payne's position is

7     before we go to trial.

8          MR. DONOHUE:  You have to agree with me,

9     though, that you had the opportunity -- not you,

10    but your partners had the opportunity to ask these

11    questions the first time around.

12         MR. VARGA:  That may or may not be true.

13         MR. DONOHUE:  So this is a second bite of the

14    apple, really.

15         MR. VARGA:  I'm continuing the Plaintiffs'

16    deposition.  I'm not going to take five hours to

17    complete the Plaintiffs' deposition.  I'm just

18    trying to find out what his side of the story is

19    before we go to trial.  I did not think it was

20    necessary for me to have to go back to the judge

21    and explain what I'm doing, and I'm asking you

22    to -- I don't think I need leeway, but I'm asking

23    you to just let me finish the questioning of the

24    witness and we'll be done with this.

25         MR. DONOHUE:  Mr. Payne, you said you wanted

PAYNE v. TAYLOR VISION                              May 13, 2005

```
1                    ROBERT PAYNE
2      to speak to me about this?
3            THE WITNESS:  I'm just rereading part of my
4      other deposition.
5            (Witness perusing document)
6  BY MR. VARGA:
7       Q    Mr. Payne, I would just ask you to look at
8  Exhibits 10, 11 and 12 and just --
9       A    I understand your question.
10           MR. DONOHUE:  Also, Doug, again, are you
11     going to provide us, then, once you have his
12     responses, as to Taylor's positions on each of
13     these points in a manner that can be utilized at
14     trial?
15           MR. VARGA:  We can go off the record if we
16     need to go off the record.
17           (Discussion off the record)
18           MR. VARGA:  We have had a colloquy off the
19     record, and I have agreed with Mr. Donohue that
20     with respect to Exhibits 10, 11 and 12, that I
21     will provide Mr. Donohue with the Defendants'
22     position as to whether or not we agree or disagree
23     that Mr. Payne performed all or part of the tasks
24     as he has denoted on these exhibits.
25           MR. DONOHUE:  That will be in a manner that
```

PAYNE v. TAYLOR VISION                                    May 13, 2005

Page 107

1                          ROBERT PAYNE

2        can be utilized at trial?  Or we'll stipulate --

3               MR. VARGA:  Correct.

4        A     Let me answer the question first by taking

5        the high road, Doug.

6        Q     I would just ask that you answer the

7        question, and the only question that I have for you

8        right now, Mr. Payne, is:  Is there anything on

9        Exhibits 10, 11 or 12 that you have indicated that you

10       performed the task, that, in fact, you were not the

11       sole person performing the task?  And if the answer is

12       yes, there are some instances of that, I would like you

13       to just make a notation next to your initials on these

14       documents just so we know what your position is in the

15       case.

16              MR. DONOHUE:  Can I interrupt and ask -- off

17       the record.

18              (Discussion off the record)

19       A     As I say, let me answer the question.

20       Q     I prefer if you didn't refer to your prior

21       deposition transcript which you have in front of you.

22       A     Why not?

23       Q     Because it's inappropriate.

24              I'm asking you to answer the question.

25              MR. DONOHUE:  You can refer him to your

# **CERTIFICATE**

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___23___ day of ___May___, 20_05_

_____
NOTARY PUBLIC
FRANCINE GARB

My Commission Expires:

MARCH 31, 2007

**SANDERS, GALE & RUSSELL**
**PROFESSIONAL COUT REPORTERS**
**SINCE 1960**
**P.O. BOX 1048**
**NEW HAVEN, CONNECTICUT 06510**

GERALD  GALE, RPR,CM                          STATEWIDE COVERAGE
STEVEN M. GALE                                TOLL FREE 800-824-4541
                                              NEW HAVEN 203-624-4157
                                                    FAX 203-624-4462
                                              EVENINGS: 203-248-0815
                                                        203-230-8265
                                         MAY 23, 2005

**JAMES DONOHUE, ESQ.**
GILBRIDE, TUSA, LAST & SPELLANE
708 THIRD AVE.
NEW YORK, N.Y. 10017

Dear Attorney DONOHUE:

    RE:  ROBERT PAYNE VS. TAYLOR VISION RESOURCES
    DEPOSITION OF: CHIRSTOPHER TALLET
                ROBERT PAYNE
    DATE:  MAY 13, 2005

    Enclosed please find copy of deposition together with Original
Jurat Page and Errata Sheet in connection with the above-captioned
action.

We ask that the deponent read and sign the deposition before a Notary
Public and return the signed Jurat Page and Errata Sheet within 30
days upon receipt to:
                **DOUGLAS VARGA, ESQ.**
                ZELDES, NEEDLE & COOPER
                1000 LAFAYETTE BLVD,
                BRIDGEPORT, CT.  06601

    Thank you for giving this matter your attention.

                    Very truly yours,

                    FRAN GARB
                    COURT REPORTER

Enc.: COPY OF TRANSCRIPT, ORIGINAL JURAT PAGE & ERRATA SHEET
CC:    DOUGLAS VARGA, ESQ.
      P.S. PLEASE FAX A COPY OF THE ERRATA SHEET TO:
            SANDERS, GALE & RUSSELL (203) 624-4462
            OR SEND A COPY  TO:
            P.O. BOX 1048   NEW HAVEN, CT 06504-1048
      **ORIGINALS ARE TO BE SENT TO ABOVE MENTIONED ATTORNEY.**

# Exhibit B

## GILBRIDE, TUSA, LAST & SPELLANE LLC

**ATTORNEYS AT LAW**
**708 THIRD AVENUE**
**26TH FLOOR**
**NEW YORK, NEW YORK 10017**

(212) 692-9666
FACSIMILE (212) 661-6328

August 17, 2005

Doug Vargas, Esq.                    BY FAX AND MAIL
Zeldes, Needle & Cooper              203 333 2489
100 Lafayette Blvd
Post Office Box 1740
Bridgeport, Connecticut 06601-1740

                        Re: Robert Payne, et. al. v. Taylor Vision
                        Resources

Dear Doug:

Following up our discussions today, I am advising our expert that the documents we have requested and re-requested (see my letter of July 16, 2005) will be forthcoming but you do not believe that whatever has been discovered will have any substantive impact. Assuming that is correct, I am asking him to wrap up his report, with the understanding that it may need to be amended if the documents do have an impact.

We would expect to get this to you by the end of the month and you can arrange to do your deposition shortly after that.

Based on your representation that this will not be a problem, we will not be asking the court for an extension of the discovery date, but will advise the court, once it is completed, that we are not making dispositive motions and request the date for the submission of the pre-trial memorandum.

We are already putting that document together and should have a working one ready soon.

                        Sincerely,


                        James P. Donohue, Jr.

# Exhibit C

# GILBRIDE, TUSA, LAST & SPELLANE LLC

FRANK J. GILBRIDE II
CHARLES S. TUSA
BENNETT H. LAST
THOMAS P. SPELLANE
JOHN P. TESEI, P.C.**
ERIC H. SELTZER
DAVID CRYSTAL II
JAMES P. DONOHUE, JR.*
FREDERIC P. RICKLES***
KENNETH M. GAMMILL, JR.

THEODORE L. SANDLER****
JONATHAN M. WELLS
SAL MELI******
CHRISTOPHER D. BRISTOL*
DOROTHY MATTHEWS FREEBURG
ASHLEY VAN VALKENBURGH

* ADMITTED IN NEW YORK ONLY
** ADMITTED IN CONNECTICUT ONLY
*** ALSO ADMITTED IN NEW JERSEY AND VIRGINIA
**** ALSO ADMITTED IN MASSACHUSETTS
***** ADMITTED IN NEW YORK AND WISCONSIN ONLY
****** ADMITTED IN NEW YORK, NEW JERSEY AND FLORIDA ONLY

**ATTORNEYS AT LAW**
**708 THIRD AVENUE**
**26TH FLOOR**
**NEW YORK, NEW YORK 10017**

(212) 692-9666
FACSIMILE (212) 661-6328

COUNSEL
ROBERT N. LITTMAN*
SHEILA ANNMARIE MOELLER****
LINCOLN W. BRIGGS

31 BROOKSIDE DRIVE
P.O. BOX 658
GREENWICH, CONNECTICUT 06836
(203) 622-9360
FACSIMILE (203) 622-9392

November 3, 2006
By Fax – 203 333-1489

Douglas J. Varga, Esq.
Zeldes Needle & Cooper PC
1000 Lafayette Blvd.
Bridgeport Ct. 06601-1740

Re: Payne et. al. v. Taylor Vision Resources
et. al.

Dear Mr. Varga:

Last week the court ruled we should pay your fees on the recent motion. Although not in the final order, it is my recollection that it was suggested if we could agree on the amount or if not, you could submit an affidavit.

If you wish to try the first course of action, please submit your bills and time sheets, with your notations as to what is to be included as relating to the motion.

In addition, we are also to submit a new scheduling order.

At this point, we are still waiting for your response to our document request of April, 2005 and the information you promised at the Payne deposition in May, 2005. We would suggest that this information be supplied by a date certain, hopefully the end of this month.

Assuming this information can be supplied by November 30, 2006 we would suggest giving our expert approximately three weeks to review it and determine if he needs to amend his previous report based on this information. The expert's report would then be delivered to you and you would have three weeks to review it, provide us with your expert's report and then schedule our expert's deposition within the next two

GILBRIDE, TUSA, LAST & SPELLANE LLC

weeks. We would then depose your expert within the next two weeks and schedule the pre-trial order for 30 days after that.

If this meets with your approval, let me know and I will draft the order accordingly for your review. If you have problems with this outline, let me know as soon as possible, so we can address such issues.

Very truly yours

James P. Donohue, Jr.

JPD/jd
Enc.

# Exhibit D

# GILBRIDE, TUSA, LAST & SPELLANE LLC

**ATTORNEYS AT LAW**
**708 THIRD AVENUE**
**26TH FLOOR**
**NEW YORK, NEW YORK 10017**

(212) 692-9666
FACSIMILE (212) 661-6328

September 7, 2005

FRANK J. GILBRIDE II
CHARLES R. TUSA
BENNETT R. LAST*
THOMAS R. SPELLANE
JOHN P. TESS, P.C.**
ERIC H. SEIZER
DAVID CRYSTAL II
JAMES P. DONOHUE, JR.*
FREDERIC PRICKLES***
KENNETH M. GAMMILL, JR.

THEODORE L. SANDLER****
JONATHAN H. WELLS
SAL MELI****
CHRISTOPHER D. BRISTOL**
DOROTHY MATTHEWS FREEBURG
ASHLEY VAN VALKENBURGH

* ADMITTED IN NEW YORK ONLY
** ADMITTED IN CONNECTICUT ONLY
*** ALSO ADMITTED IN NEW JERSEY AND VIRGINIA
**** ALSO ADMITTED IN MASSACHUSETTS
***** ADMITTED IN NEW YORK AND WISCONSIN ONLY
****** ADMITTED IN NEW YORK, NEW JERSEY AND FLORIDA ONLY

COUNSEL
ROBERT N. LITTMAN*
SHEILA ANNMARIE MOELLER*****
LINCOLN W. BRIGGS

31 BROOKSIDE DRIVE
P.O. BOX 658
GREENWICH, CONNECTICUT 06836
(203) 622-9360
FACSIMILE (203) 622-9382

Doug Vargas, Esq.
Zeldes, Needle & Cooper
100 Lafayette Blvd
Post Office Box 1740
Bridgeport, Connecticut 06601-1740

Re: Robert Payne, et. al. v. Taylor Vision
Resources

Dear Doug:

I have recently been advised that our expert has discovered that one of his present partners has had business dealing with your clients and he believes he must, therefore, withdraw as a proposed expert.

Obviously, this puts us in a bit of a bind since I am back to space one in getting an expert's report done, which I expected to have by now. We do intend to find another one, and while we are searching, we still need those documents. If this causes you any problems, let me know.

Sincerely,

James P. Donohue, Jr.

JPD/jd

# Exhibit E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------

ROBERT PAYNE and PAYNE INVESTMENTS  :
LLC,
                          Plaintiffs,       :

                                            :      No. 202CV2234 (AWT)

          -against-                      :

                                          :

TAYLOR VISION RESOURCES, TAYLOR
STRATEGIC ACQUISITIONS, TAYLOR       :     AFFIDAVIT IN RESPONSE
STRATEGIC DIVESTITURES, and TAYLOR           TO REQUEST FOR FEES
FINANCIAL SERVICES LLC, all defendants  :
collectively operating under the name
TAYLOR COMPANIES,                     :

                   Defendants.       :

----------------------------------------------------------

STATE OF NEW YORK

COUNTY OF NEW YORK

      JAMES P. DONOHUE, JR, being duly sworn, deposes and says:

      1. I am over the age of 18 a member of the firm of Crystal & Donohue, attorneys

for the Plaintiffs, Robert Payne and Payne Investments LLC ("Payne") and understand

the obligations of an oath.  I submit this affidavit in response to the motion by the

Defendants to have their attorneys fees fixed.

      2. The facts on this application can be briefly stated.  Payne began an action

against the Defendants (collectively referred to as the "Taylor Companies") for breach of

a written employment contract. After numerous extensions to allow the Taylor

Companies to complete their required discovery, the matter was dismissed due to lack

of activity.  Payne's counsel moved to have the matter reopened so it could be resolved

on the merits. The Defendant's opposed the reopening of the case.

3. A hearing was held on October 23, 2006.  As set forth in the electronic filing of

the order annexed hereto as Exhibit A

> MOTION to reopen case filed by Robert Payne, Payne
> Investments LLC. The motion to reopen, the denial of which having been
> vacated, is granted. Sanctions imposed by the court: plaintiff's counsel
> shall pay the attorneys' fees and costs that were expended by defendants'
> counsel regarding this motion. Defendants' counsel shall submit affidavit
> re: same. The parties shall file an updated scheduling order. 55 minutes
> (Court Reporter Huntington) (Smith, S.) (Emphisis added).

4. On November 3, 2006, in compliance with this order, Payne's counsel wrote to

Defendant's counsel to propose the outline of an updated scheduling order (similar to

the ones that had previously been agreed upon). Inquiry was also made if the

Defendants wished to resolve the issue of the fee without the filing of the affidavits and

additional motion practice by submitting their time sheets with "your notations as to what

is to be included as relating to the motion" (Exhibit B).

5. On November 10, 2006, the Defendants responded by providing their affidavits

and time sheets which would comprise their application (See covering letter, Exhibit C)

claiming they would "seek a total of $20,016.41 as itemized in the attached Affidavits."

Efforts to resolve this issue were unsuccessful (as acknowledged by Defendants in their

submission) at least in part due to the inability of Defendants' counsel to get

authorization from his client (Exhibit D, letter of January 22, 2007, confirming impasse

on the issue of fees due to lack of authorization).

6. In addition, in December, there being no objection to the outline proposed in the November 3, 2006 letter (Exhibit B, supra) the proposed form of rescheduling order was submitted to Defendants' counsel (Exhibit E). Defendants' counsel then took the position, for the first time, they would not even discuss the proposed rescheduling order until their fee issue, which had not yet been filed, was resolved.[1]

7. Plaintiff's counsel advised Defendants' counsel that since they had indicated they had no authority from their client to compromise their claim, there appeared to be no possibility of resolution. In addition, it was requested that if they insisted on refusing to cooperate in filing the scheduling order until their fees were fixed, they should file their application and eliminate what Defendants' counsel asserted as the only road block to complying with the court's direction to re-file a new scheduling order. (Exhibit D, p 4) The request was ignored.

8. A second request was made to file the motion so the sole objection to finalizing the scheduling motion would be removed (Exhibit F). This time, Plaintiff's counsel was advised it would be done on the week of February 26, 2007 and part of the motion was filed on the last day of that week, although at least one affidavit (by Mr. Varga) was not filed until later without any explanation for withholding it for four days.[2]

Objections to the Fee Application

---

[1]. The refusal to discuss the rescheduling order is even more absurd in light of the fact that on this application for fees for opposing the motion, the Defendants counsel has included time spent on this case after the decision to restore was granted and includes discussions with this office on the new scheduling order and discussion on another case.

[2]. A reference to statements in "Mr. Varga's affidavit" in the Defendants' application (which was not in the filings made on Friday) made it clear to the Plaintiff's counsel that the documents initially filed were incomplete. A call was made to Defendants counsel and what is understood to be the last filing, was made Tuesday, March 6, 2007 with instructions to ignore an affidavit that was previously filed.

27. While it is clear that the Defendants' counsel spent some time in opposing the motion to reopen, it is also clear that the present application substantially exaggerates the amount of time spent in opposing the motion, by including time that clearly was not related to the opposition and including duplicate time. The attempt to hide this, by repeatedly using multiple work entries on a single time entry and by using vague references should not be rewarded and Defendants counsels' application should be substantially reduced to what the reasonable costs of defending the motion to restore.

James P. Donohue, Jr.

Subscribed to and sworn to
before me this 7th day of
March, 2007

DAVID CRYSTAL II
NOTARY PUBLIC, STATE OF NEW YORK
No. 81-0316935  02CRO816025
Qualified in New York County
Commission Expires Dec. 31,  2009

# Exhibit F

# CRYSTAL & DONOHUE

708 Third Avenue
New York, New York 10017
(212) 692-9030
Fax (212) 661-6328

January 22
By Fax – 203 333-1489

Douglas J. Varga, Esq.
Zeldes Needle & Cooper PC
1000 Lafayette Blvd.
Bridgeport Ct. 06601-1740

Re: Payne et. al. v. Taylor Vision Resources
et. al.

Dear Mr. Varga:

This is in response to your letter of December 26, 2006 and the two issues it raised.

<u>The Reschedulng Order</u>

First, with respect to the rescheduling order, I had provided you with a written proposal on November 3, 2006. You did not object to it.

About two weeks later, 0n November 17, 2006, I confirmed with you in writing the following:

On a separate matter, we raised in our last communication with you, which you have acknowledged receiving, the format and dates for a new scheduling order. Your letter in response did not take exception with our proposed format or dates

There apparently being no disagreement on the general format of the proposed order, I will proceed to draft a proposed order for your review within the next few days.

As you acknowledged, you called me on November 22, 2006. You acknowledged receiving our letter of November 17, 2006. You did not assert any disagreement with our proposal or any reason not to move forward and certainly did not tell me not to draft a proposed order. Consequently we did as proposed and forwarded to you in December followed the outline of our letters as well as the outline of the previous extension orders, most of which were drafted by your office.

More than a month after that discussion and those letters, you advised me in your letter for the first time that "we are in no position to discuss a revised scheduling order" because the court made it conditional on the "payment of fees". The document I received from the court had no such condition. It stated:

> Minute Entry for proceedings held before Judge Alvin W. Thompson: Motion Hearing held on 10/23/2006 re [57] MOTION to reopen case filed by Robert Payne, Payne Investments LLC. The motion to reopen, the denial of which having been vacated, is granted. Sanctions imposed by the court: plaintiff's counsel shall pay the attorneys' fees and costs that were expended by defendants' counsel regarding this motion. Defendants' counsel shall submit affidavit re: same. The parties shall file an updated scheduling order. 55 minutes (Court Reporter Huntington)(Smith, S.)

Thus it appears the parties were to proceed simultaneously on both issues. If you have some other document which supports your position for delaying submitting the updated scheduling order, please provide it.

Settlement of Fee Issue

With respect to your recollection of the phone discussion on the issue of settlement of those fees, your letter leaves out some important details and does not answer the question we posed to you.

We initially inquired as to whether you wished to fix the amount of fees by agreement in our letter to you of November 3, 2006. You provided your proposed application. By letter of November 11, 2006, we pointed out to you numerous problems with your proposed submission.

Among these problems included failure to distinguish between individual tasks, for which we provided concrete examples, stating:

> With respect to your time and submissions, we would note, at the outset, that a fair review of your time records would indicate that you have not made any effort to distinguish between how time was spent by any one person, on any one day, when they are engaged in several tasks. Anyone reviewing this application, as it is presently written, will have to guess as to the actual breakdown of time spent in defending the motion as opposed to other types of work. Just by way of example, we note that on some entries, time was spent in preparing exhibits, normally a function of a clerical staff member, conferences were held with the client (who submitted no affidavits and did no legal work) and telephone conferences were held with this office (and we were not involved in the defense of this motion) and all these type "services" are then lumped in with other services, such as "drafting" and "research",

Your proposed application also included duplication of effort, in which we pointed out that

[of the] approximately 70 time entries that are submitted, approximately half are devoted either exclusively or primarily to some sort of conference, either in the office or telephone conferences outside the office, usually with what appears to be the client. As just an example, the first entries submitted are, in pertinent part, as follows:

SWP –Telephone conference with Attorney Crystal…telephone conference with Attorney Lane

JDZ  - Intraoffice conference; telephone conference with Mr. Stein

SWP – Telephone conference with Attorney Crystal…telephone conference with Attorney Stein [plus a review of the expert's report, previously reviewed in the first entry]

JDZ – intraoffice conference; telephone conference with Mr. Stein

SWP – Review motion to reopen [previously reviewed in the first entry] correspondence to Attorney Lane. intraoffice conference… .

* * * * *

The likelihood of double billing shows up again and again, even when conferences are not involved.  For example, there are entries for "preparation" for court appearance on one day, and the same "preparation" re-appears in a subsequent entry,

Nevertheless, despite these problems, we did propose a specific amount to settle the issue.

In our subsequent phone conversation you made it clear to me that your client had not given you any authority to settle the fee application.  Nevertheless, you recognized there were problems with the application as it existed and indicated you would try to get authorization for a reduction but only if we agreed, in advance, to increase our offer to the amount you were going to attempt to get authorization to settle.

I believe I made it clear to you that the amount you were seeking to have us "offer" without even having the authorization to accept, would not be offered by this firm and certainly would not be offered if you had no authorization from your client to accept.

Your letter of December 26, 2006, does not set forth that your "proposal" was being made without authorization and that we make an offer that you would then try to

get authority to accept. I made it clear we would not agree to that number, but we would entertain further discussions <u>if you had authority to do so.</u> .

Your letter of December 26, 2006 does not indicate if you now have authority to make this proposal or not.

To make this as clear as possible, if you <u>have authority</u> to make this offer, and wish to confirm that in writing, then we will respond. However, as I told you over the phone in November, while we will respond to any authorized offer, we will not accept your initial unauthorized number, just as your client has (apparently) rejected our proposal.

If your obtain authority to negotiate, we will seek, in good faith, to resolve the issue with you .But if you do not have such authority, it makes no sense to waste your time or mine. This already happened once before, when we attempted to settle the over-all matter and we showed up with our client and your firm showed up with Mr. Taylor's daughter. Thus, if you have authority, let us know and we will respond.

If you do<u> not have authority</u>, then there is nothing for us to respond to. If you are delaying resubmitting the new rescheduling order, pending a resolution of the fee issue, and have no authority to settle the fee issue, then you should not be attempting to delay the rescheduling order by holding up the fee application with the discussion of proposals that you have no authority to make. If no authority to hold a discussion exists, you should file the fee petition and we will respond to the court.

Very truly yours,

James P. Donohue, Jr.

JPD/jd

Exhibit G

# GILBRIDE, TUSA, LAST & SPELLANE LLC

**ATTORNEYS AT LAW**
**708 THIRD AVENUE**
**26TH FLOOR**
**NEW YORK, NEW YORK 10017**

(212) 692-9666
FACSIMILE (212) 661-6328

FRANK J. GILBRIDE II
CHARLES S. TUSA
BENNETT R. LAST*
THOMAS F. SPELLANE
JOHN P. TESO, P.C.**
ERIC H. SELTZER
DAVID CRYSTAL II
JAMES P. DONOHUE, JR.†
FREDERIC R. RICKLES***
KENNETH M. GAMMILL, JR.

THEODORE L. SANDLER****
JONATHAN M. WELLS
SAL MELI*****
CHRISTOPHER D. BRISTOL**
DOROTHY MATTHEWS FREEBURG
ASHLEY VAN VALKENBURGH

* ADMITTED IN NEW YORK ONLY
** ADMITTED IN CONNECTICUT ONLY
*** ALSO ADMITTED IN NEW JERSEY AND VIRGINIA
**** ALSO ADMITTED IN MASSACHUSETTS
***** ADMITTED IN NEW YORK AND WISCONSIN ONLY
****** ADMITTED IN NEW YORK, NEW JERSEY AND FLORIDA ONLY

COUNSEL
ROBERT N. LITTMAN*
SHEILA ANNMARIE MOELLER*****
LINCOLN W. BRIGGS

31 BROOKSIDE DRIVE
P.O. BOX 659
GREENWICH, CONNECTICUT 06836
(203) 622-9360
FACSIMILE (203) 622-9392

December 22, 2006
By Fax -- 203 333-1489

Douglas J. Varga, Esq.
Zeldes Needle & Cooper PC
1000 Lafayette Blvd.
Bridgeport Ct. 06601-1740

Re: Payne et. al. v. Taylor Vision Resources et. al.

Dear Mr. Varga:

Following up on my earlier letters and our discussions I enclose the proposed scheduling order. Please review and get back to me as soon as possible. I will be on vacation next week, but would like to get this to the court right after that.

Very truly yours

James P. Donohue, Jr.

JPD/jd

# Exhibit H

# CRYSTAL & DONOHUE

708 Third Avenue
26th Floor
New York, New York 10017
(212) 692-9030
Fax (212) 661-6328

February 21, 2007

By Fax – 203 333-1489

Douglas J. Varga, Esq.
Zeldes Needle & Cooper PC
1000 Lafayette Blvd.
Bridgeport Ct. 06601-1740

Re: Payne et. al. v. Taylor Vision Resources
et. al.

Dear Mr. Varga:

Almost a month ago we requested that if you had some document which supports your position that you are entitled to refuse to work on the submission of a new scheduling order that your provide it to us.   You have not responded.

As we noted in our last communication to you, the order of the court in the minutes appears to be mandatory, not conditional: "The parties shall file an updated scheduling order. " We submitted our proposal to you in November and the formal document in December. Your subsequent notification that you felt no obligation to cooperate on this filing has yet to be substantiated and appears to directly contradict the direction of the court.

More significantly, the only reason you have given for not cooperating in filing the updated scheduling order was that the court had not fixed your fees and this was viewed as a pre-condition to reinstatement. However, despite the fact the decision reinstating the case was issued almost four months ago, you have yet to file your affidavits on this issue.

While we made a proposal to settle the fee issue in November, you advised us your client had rejected our offer and that you had no authority to make a counter-proposal from your client. We have advised you that your willingness to try and convince your client to accept a proposal you had made to us without their authorization, is not an acceptable way to proceed.

As we have advised you, if you authority from your client, we will respond.  If you do not, you should file your motion and we will respond to that filing.

If we do not have any response from you on these issues, we will have no alternative but to advise the court of your refusal to both file the affidavits you were instructed to file as well as your refusal to cooperate in the resubmission of a new scheduling order.

Very truly yours,

James P. Donohue, Jr.

JPD/jd

# Exhibit I

**Report of**
**David B. Epstein**
**of Bentley Associates L.P.**
(March 7, 2006)

In regards to:

*Robert Payne et. al. v. Taylor Vision Resources*

**Report of**
**David B. Epstein**
**Of Bentley Associates L.P.**
(March 7, 2006)

In regards to:

*Robert Payne et. al. v. Taylor Vision Resources*

**Engagement:**

David B. Epstein, of Bentley Associates L.P. was engaged by Gilbride, Tusa, Last & Spellane LLC to render an independent opinion based upon industry standards in the litigation entitled Robert Payne et. al. v. Taylor Vision Resources, in U.S. District Court, District of Connecticut, Index No. 202 CV 2234 ("Litigation") to assist in determining the fair and reasonable compensation due to Robert Payne and Payne Investments, LLC (together "Payne") for Payne's services provided to Taylor Vision Resources ("Taylor") pursuant to the employment agreement between Taylor Companies and Robert Payne dated November 20, 1999 (the "Agreement").

A copy of my engagement letter is attached as Exhibit A.

**Personal Background and Experience**

I have been involved in the financial services industry for over 28 years. During that entire period, my work has been in the area of corporate finance with specific focus on mergers and acquisitions, private placement of debt and equity securities and various other financial advisory services, including valuations and fairness opinions. I have extensive experience in arranging fee agreements with clients, providing investment banking services and advising clients in arranging purchase or sale transactions.

I graduated from Brown University in 1974 with a bachelor's degree in Economics and International Relations. I received an MBA, with concentrations in finance and accounting, from Columbia University Graduate School of Business in 1977. In June 1977, I joined the Corporate Finance Department of the Merchant Banking Group in Citicorp. From 1977 to 1980, I worked in several different areas of the corporate finance and project finance departments. Between 1981 and 1991 I worked in the Mergers and Acquisitions Department. During my time in the M&A Department, I was extensively involved in building our global capabilities and worked extensively on cross-border transactions. In 1991, I co-founded Bentley Associates L.P. and Bentley Securities Corp., an investment banking firm where I am currently a Managing Director. My work at Bentley encompasses many different facets of corporate financial advisory services including mergers and acquisitions, private placement of securities, valuations, fairness opinions,

litigation support services and other financial advisory services. In 1999, I was engaged to render an independent opinion in the litigation entitled *Mina Investment Holdings Ltd. v. Lefkowitz, No. 97 Civ. 1321 (S.D.N.Y.).* In 2003, I was engaged to render an independent opinion in the litigation entitled *Gruppo, Levey & Co. & GLC Securities Corp. v. ICOM Information & Communications, Inc. Index No. 01 CV 8922 (S.D.N.Y.).*

In addition to my current work in investment banking, I have also served as an Adjunct Professor at Rider University, The College of New Jersey and Rowan University. Beginning in the fall of 2001, I taught at one or more of these schools in each of the next eight fall and spring semesters, teaching courses in Microeconomics, Macroeconomics and Money and Banking.

A copy of my resume is attached as Exhibit B.

### Summary of Information Reviewed and Facts Considered:

In arriving at my opinion, I reviewed the following information in this Litigation: Contract Agreement dated November 20, 1999; Summons dated December 18, 2002; Complaint dated December 13, 2002; Answer to Complaint and Affirmative Defenses dated November 21, 2003; Report of Parties Planning Meeting dated February 24, 2004; deposition transcripts of Ralph Taylor, Ron Flack, Kenneth Griffin, Rolf Borjesson; letter to Jacob Stein, Esq., Stein Mitchell & Menzies, LLC, dated March 25, 2002l; letter to Jacob Stein, Esq., Stein Mitchell & Menzies, LLC, dated April 23, 2002; letter to James Donohue, Esq., Gilbride, Tusa, Last & Spellane LLC, dated May 8, 2002; letter to Jacob Stein, Stein, Mitchell & Menzies, LLC, dated May 10, 2002; Taylor Strategic Divestiture document (marked Exhibit 1, 3-19-05); deposition transcripts of Mark Schneider, Robert Payne.

The following are some of the key facts concerning Robert Payne's employment by Taylor and Robert Payne's work while at Taylor, as disclosed in the documents reviewed:

1.  Robert Payne was engaged by Taylor pursuant to an offer contained in a letter from Taylor to Payne dated November 20, 1999 the main terms of which are summarized as follows:

    (a)  Commissions of 10.0% to be paid on "net revenues" from contracts on which Payne "manage[d] the transaction or project".

    (b)  Additional 5.0% commission ("Additional Commission") to be paid on "net revenues" from contracts on which Payne took "responsibility for leading the marketing efforts which Taylor has not served prior to [Payne's] employment". "Contract closure should be completed without the assistance of any executive level Taylor personnel. In those instances in which another Taylor executive directly assists in contract closure, the aforementioned percentage will be reduced to 2.5%."

2

(c)    A bonus commission ("Bonus Commission") of 5% (or 2.5%) (the exact percentage amount determined on the same basis as noted in paragraph (b) above) on the first $1,500,000 "net revenues" generated from Payne leading the marketing efforts. This bonus is in addition to the Additional Commission and is to compensate Payne for forfeiting a $75,000 bonus from his present employer.

(d)    An annual draw of $125,000 against commissions.

(e)    "Once Commissions earned exceed the annual base draw in any calendar year, commissions due will be paid monthly. There will be no true-up or carryover of annual short fall from draws advanced..."

(f)    In addition to the above money compensation items, the engagement letter provided for Taylor to (i) provide a laptop computer and assume various telecommunication expenses, (ii) pay medical, dental and life insurance premiums after 30 days employment, (iii) allow Payne to participate in Taylor companies 401(k) plan with a matching 25% of contributions up to statutory limits, and (iv) three (3) weeks paid vacation during the first year of employment.

2.    There are three projects (engagements/transactions) on which Payne worked while employed by Taylor which are material to this litigation. They are: (i) Mitek; (ii) Borden Chemical and (iii) Dow Chemical Sentrachem.

3.    Taylor received fees for each of the three engagements/transactions named in item 2 above.

4.    Payne disengaged from Taylor in or about December 2002 because, despite repeated requests for compensation pursuant to his employment agreement for his work at Taylor, he only received his draw. Prior to Payne's disengagement from Taylor, there were no reviews or letters indicating that Payne was not performing pursuant to his employment agreement while working at Taylor.

5.    Payne engaged the services of Gilbride, Tusa, Last & Spellane on or about March 21, 2002, in order to try to recover, from Taylor, compensation owed to him pursuant to his employment agreement.

6.    On March 25, 2002, Gilbride Tusa, Last & Spellane wrote the first letter to Taylor's legal counsel on behalf of Payne requesting Payne's full compensation pursuant to his employment agreement.

7.    The first written response to Payne's claims for compensation and other remuneration pursuant to his employment agreement pursuant to the letter of March 25, noted in 6. above, is articulated in a letter from Stein, Mitchell & Menzies dated April 5, 2002 in which Payne's claims with regard to the Mitek and DowChemical Sentrachem engagements/transactions are claimed to be "misplaced". There is no reference to the

3

Borden Chemical engagement/transaction. This letter also denies Payne's other claims including (a) bonus commission, (b) reimbursement for benefits and (c) laptop computer.

8.   On May 8, 2002, following further correspondence from Gilbride, Tusa, Last & Spellane, Payne received some additional money from Taylor for compensation claimed pursuant to Payne's employment agreement. This payment related to Borden 1 and Borden 2.

9.   On or about October 7, 2002 Payne received additional money from Taylor toward his Bonus Compensation.

10.  On or about December 30, 2002 Payne received additional money from Taylor relating to Borden.


**General Overview of a Managing Director and Related Compensation:**


1.   General Definition:


A Managing Director is a senior individual. The term "Managing Director" was the traditional term for "the top executive" in the United Kingdom and other English speaking countries (other than the United States). Over time, many US businesses adopted the term Managing Director. More modern definitions of the title, as found in some dictionaries are: (1) "A person who manages a business though not the owner or chief executive." and (2) "someone who controls resources and expenditures."

These definitions typically apply to manufacturing firms, not service based businesses. Service businesses, whether in banking, investment banking, advertising or other similar types of businesses are traditionally staffed with more senior individuals relative to the total number of employees than one would find, for example, in manufacturing firms. Because in service businesses, client service requires the attention of many more senior people than in a manufacturing business, service firms tend to have many more people with senior titles. For example, commercial banks have traditionally been staffed with many more vice presidents than one would find in a manufacturing business. Thus, the meaning of the title varies depending upon the type of organization in which it is being used. Burston-Marsteller, a leading PR firm defines the role of a Managing Director as follows: "A Managing Director contributes to the overall performance of the firm by managing current client relationships and programs, generating new business, recruiting, developing and growing staff".

The title Managing Director can convey the fact that the person has senior management responsibilities, more consistent with the traditional definition as used in manufacturing companies and/or the title is used to signal to clients that the person is a senior individual on par with other Managing Directors at other similar firms. When used primarily for external purposes, there may be little or no management responsibilities associated with the title.

4

Within the investment banking community, including both large full service firms and smaller "boutique" firms, the title Managing Director is used both for external and internal purposes interchangeably. Sometimes, when an individual is also a department head or in a clear management role, there is an additional functional title, such as "Department Head", which is used in addition to the title Managing Director. When the title is used primarily for external purposes, to convey to the client that the individual is a senior person, the title conveys that the person has attained a certain level of experience that qualifies the person for the title. Typically, in investment banking, one gains the necessary level of experience by working on many different types of projects. One learns all the necessary steps involved from the initial marketing through completion of the project, whether it be concluded with a report or the closing of a transaction. However, just because one has gained the experience and knowledge of all these different steps, this does not mean that the Managing Director is either responsible personally or in terms of oversight for all the different steps involved. A clear example would be a "new business" group within an investment bank. Many large investment banks have a team of individuals whose sole responsibility is to develop new business. Some of these individuals might have the title of Managing Director. Merely having the title, Managing Director, however, does not change the fact that functionally these individuals are tasked with simply developing the new business and then turning it over to others to process. Likewise, some of the persons who are involved in the processing of the business might have a Managing Director title but little or no responsibility for marketing any business.

2.      Compensation of Managing Directors in Investment Banking Firms:

Compensation on "Wall Street" has historically been primarily bonus driven. Thus the predominant factor that affects the level of one's salary is the success of the firm. This factor will set the level of bonuses for all employees. The factor which has traditionally been the most important in determining how a bonus is distributed in a firm is the amount of revenue (fees) earned by the firm on work performed by the individual managing director.

In smaller "boutique" firms, such as Taylor, one might reasonably find that compensation would typically be even more linked to the fees generated by an individual than might be the case at a larger firm where there might be other factors, such as development of junior staff, and other administrative matters.

It is also typical on Wall Street that when a person moves from one firm to another, there is a contract that provides for a guaranteed level of compensation for a period of time. Such a guarantee is common in order to provide some assurance that during a transition period into a new firm with a different group of people and perhaps a different method of determining compensation that the individual would receive a certain guaranteed minimum compensation. This guarantee also is provided because there is typically a period of transition where the individual might not be as productive due to the fact that it takes time to develop new business.

In addition, it is typical in larger firms that there are formal performance reviews and documentation of performance in order to minimize problems of subjectivity and misunderstanding when bonuses are distributed. Thus, one might require a contract when one moves from one firm to another as a method to minimize the subjectivity in the review process.

5

In a smaller firm, where compensation may be determined by one individual, the concern of subjectivity is much greater and thus the use of a contract is much more common. Accordingly, a managing director with an employment contract which specifies an agreed compensation or compensation package (which may include percentages of fees earned from projects on which the managing director worked) will be compensated pursuant to the contract. The type of project or how the fees were earned on the project would not affect the compensation of the Managing Director unless specifically detailed in the employment agreement.

### Review of Robert Payne's Agreement:

While there are no standard forms of contracts used, Payne's Agreement appears to be the type of contract that one would see for the hiring of a person at a senior level such as a Managing Director. While the percentages may vary and some of the particulars of the job description may vary, in general, the concept of a base and bonus or draw against commission is rather standard practice in the industry. In addition, the concept of an incentive or additional compensation for lead generation above and beyond production is also standard, although it might be more common in regard to employment by smaller firms rather than larger firms. Another provision that is very standard in the industry is a provision to "make-up" for one's lost bonus from the firm the individual is leaving. Such a provision is more typically presented as a guaranteed amount rather than an additional bonus incentive. Finally, one other provision that is oftentimes found in contracts such as this one, but is not in Payne's Agreement, is a termination clause.

### Review of Some Issues in this Litigation as Relates to Payne's Agreement:

1.     Acquisitions vs. Divestitures:

A question has been raised as to whether one would expect a contract such as Payne's Agreement to apply to both acquisitions as well as divestitures. The answer is yes it would. While there might be a distinction made between mergers and acquisitions vs. financing or some other aspect of investment banking work, it would be highly unusual for there to be any distinction between or among the different types of merger and acquisition work. The reason for this is that oftentimes discussions about either (i) an acquisition or (ii) a divestiture/for-sale transaction might lead to a transaction involving the other. Since most firms are simply interested in maximizing the fees earned and not trying to pigeon hole individuals so that there is a disincentive to produce fees, then in most instances the commissions would apply to all fees earned regardless of the structure of the transaction which generated the fees.

If there were a distinction between M&A and financing, that would be to clarify the functional position for which the individual is being hired. However, if there were a clause providing for additional commission for fees generated from leads introduced to the firm then such a provision would apply to all leads introduced not just those in one functional area vs. another.

6

2.    Role of a Managing Director and other Issues Relating to the Mitek Engagement:

    A.    What would be the duties of a Managing Director in this transaction?

A Managing Director is one who brings senior experience to a project and typically has the authority to make decisions and interact with the client without further supervision. The Managing Director is usually the one who is focused on the overall aspects of the assignment.

A Managing Director may or may not work alone on a given engagement/transaction. It is hard to state, and that is why it is rarely done, which part of the process of an engagement (from initial client retention to completing the assignment) is the most important. Sometimes, a single Managing Director manages the entire process other times (and this is more frequently the case) there are a number of individuals involved. The team approach, which is more common, assures that if one person is unavailable due to the press of other business, or ill health, then another team member will fill-in. In addition, the team approach recognizes that different individuals have different strengths, some may be better at interacting with the client while others are better at managing the process. Unless the Managing Director is working alone, then normally a good Managing Director would use whatever resources are available in order to complete the assignment successfully and earn fees for the firm. The coordination of the full resources of a firm is the mark of a good Managing Director. It helps to ensure success on the project, good client relations and good training of support staff.

Based upon the information reviewed, the fact that others were involved in the Mitek transaction, at different stages, does not appear to change Payne's status as a Managing Director with Taylor or for the Mitek transaction.

    B.    What is the impact of an unsolicited offer and would it affect a Managing Director's compensation?

In the course of selling a business, sometimes an unsolicited offer, that is an offer to purchase the target company, is made by someone or some company that was not approached by the seller or the seller's advisor.

In the course of selling a business, the key objective is to find a buyer and close the transaction. If the seller retains an advisor, the advisor's duties are detailed in an engagement letter. Amongst others, the advisor is usually tasked with identifying and approaching potential buyers with the approval of the seller. Sometimes, the seller has already had discussions with one or more potential

buyers prior to the engagement of the advisor, sometimes the seller may want to contact some of the potential buyers directly and still other times the seller or the seller's advisor may receive an offer from a buyer that was unsolicited.

Regardless of how a potential buyer makes an offer, solicited by the advisor, solicited by the seller directly or unsolicited, the offer is typically incorporated into the process being managed by the advisor. Frequently, engagement letters provide that if the client receives inquiries or offers directly, then they are to be conveyed to the advisor. Depending on where in the process the offer arrives, it may or may not have a material effect on the amount of work being undertaken by the advisor. For example, if the unsolicited offer arrives at the beginning of the process, the advisor may still need to conduct the normal process to put that offer in context or if the offer arrives toward the end of the process, then the majority of the contacting work has already been done. Thus, the presence of an unsolicited offer in and of itself does not indicate whether it has changed the amount of work undertaken by the advisor. Even if the presence of the unsolicited offer had reduced the amount of work, compensation in the investment banking industry for Managing Directors for merger and acquisition advisory work is not normally determined based upon hours or effort. Compensation is almost always based solely upon how much money was generated (fees earned), regardless of the effort. Thus, if one could generate more money with less effort, theoretically one should be compensated even more.

Based upon the information reviewed, Mitek paid a fee (apparently the full fee) to Taylor pursuant to an engagement letter, even though the transaction was completed with a buyer that was solicited by the seller directly. Unless specifically detailed in the engagement letter to the contrary, the normal fee engagement letter with a client would have required the client to pay the full fee regardless of whether the offer was solicited by the advisor or not. Thus, once Taylor received the fee, the fact that the transaction closed with a buyer who made an unsolicited offer would normally be of no consequence. On Wall Street, this transaction would be viewed as a huge success by the firm and the individuals who worked on it. Accordingly, the Managing Director, like all employees who worked on the transaction should receive their normal compensation based upon the fees received.

C.   What is typically the process involved when a complaint arises?

The first thing that an investment bank, or any organization for that matter, tries to do is to make sure that its customers have a positive experience and that the customers will use the firm's services, or buy its products, again. Thus, if there is a complaint from a client/customer, it would seem logical that the firm would look into the complaint and take steps to make sure that the problem is resolved. And in fact, this is exactly what typically happens. If the complaint emanates

from a client concerning a certain individual working with the client, then the firm might try to accommodate the client by reassigning the individual to other projects or other clients. If the complaint arose from within the firm from amongst team members working on a project, then normally the most senior person involved would investigate the matter by speaking to the team members or even the client to determine what the issue is and whether it is affecting the client relationship. The one thing that is not reasonable and most likely would never occur is that a complaint (alleging that the client was upset or concerned about something) would arise and no one (not even the client) would know about it. Even if there were reasons for not discussing a complaint in the heat of a transaction, it most certainly have been discussed or documented immediately after the transaction closed.

Sometimes there are issues that arise during the course of an engagement that might seem like a problem, but in hindsight when the transaction closes and if the client is satisfied with the work, then what may have seemed like a potential problem might be dismissed. Most firms conduct annual or year-end reviews and document the performance of all individuals within the firm. This is done so that there will be a written record of any complaints or issues. While any major issue would most likely be documented in a contemporaneous manner, the year-end or annual review would also detail the issue. If there were no documentation as to any issue then it is reasonable to assume that there were no issues or complaints that rose to the level of being mentioned or affecting a person's performance review.

Based upon the information reviewed, it appears that the only mention of a complaint or concern about Mr. Payne's performance arose when Mr. Payne tried to collect the commissions due pursuant to his employment contract. There does not appear to be any record or documentation of any complaint concerning Mr. Payne's performance prior to those mentioned after Mr. Payne's formal request for monies due. If the complaints were of a nature that it would affect Mr. Payne's compensation or employment, one would have expected to have seen evidence of such complaints or concerns by way of communication to Mr. Payne or other documentation in some file maintained about him with those in charge.

3.     Issue Related to the Borden Engagement:

Payne's Agreement provides for an extra 5% commission from contracts "which [Payne] take[s] responsibility for leading the marketing efforts with companies which Taylor has not served prior to [Payne's] employment" and "Contract closure should be completed without the assistance of any executive level Taylor personnel." The Agreement continues by stating that if another Taylor executive "directly assists in contract closure" the extra commission would be 2.5% not 5%.

9

It is not uncommon to have a provision for an extra commission for generating a lead or introducing a new client. The main purpose of this type of language is to recognize and reward the person (in this case Payne) for introducing a new client (in this case Borden) to the firm (in this case Taylor). Rarely does a person (including a Managing Director) in an investment bank, including a small firm such as Taylor, solicit and receive a signed engagement letter (contract closure) solely by oneself without the involvement of one or more persons within the firm. Thus, it is more common to recognize this fact by rewarding the person for introducing the idea or the client whether or not others have been involved in the marketing effort.

Based upon the information reviewed, (including the Affidavit and Deposition of Mr. Mark Schneider, (Borden's CEO) it is clear that in this situation, Payne did introduce to Taylor a company (Borden) with whom Taylor had not done any previous work and Payne managed the process of getting Borden to engage Taylor for an M&A advisory assignment. Payne, as the Managing Director at Taylor, marketing to a company and management at that company well known to Payne, could clearly arrange contract closure without the assistance of any executive level personnel at Taylor. Although Mr. Schneider, in his deposition, stated that 20% of his contacts with Taylor during the negotiation or the engagement agreement were with Dermott Coughlin, it appears from Schneider's deposition that these contacts were more directed at establishing a strong client relationship, rather than Coughlin in any way directly assisting in contract closure. The involvement of Mr. Coughlin in the process of marketing to Borden is consistent with normal industry practice of introducing others to develop a broader client relationship within the firm. Therefore, since it does not appear that "direct assistance in contract closure" was needed or was involved in this situation, Payne should be entitled to the entire 5% additional commission on the Borden transaction.

4.      Issue relating to the Dow Sentrachem Engagement:

The issue of dispute relating to this transaction appears to be (a) if a Managing Director and the employer had a dispute involving compensation, would the Managing Director be justified in declining to continue work, (b) if the Managing Director stops working for an employer and stops working on a transaction in progress, what is the normal and customary procedure in compensating that Managing Director and (c) would the answer to the question posed in (b) above be affected if the reason for the Managing Director declining to continue to work was for cause.

Managing Directors move from one firm to another all the time in the investment banking industry. Typically, when one leaves a firm voluntarily, one leaves behind any residual compensation that might have arisen from projects on which the Managing Director was actively working. An exception to this would be in the case where the Managing Director and the employer specifically make arrangements that are different. Especially in smaller firms or where the person leaving is not pursuing competing employment, then one might see an exception so that the project or transaction can be successfully concluded.

If a Managing Director stops working on a transaction for compelling reasons, the question is what are those reasons and how would this situation be handled. If an individual Managing Director has serious and justifiable compelling reasons to cease to work on a transaction based upon the actions of his firm, and the transaction closes, what if any compensation is due to the Managing Director who disengaged from the project.

This is not a normal occurrence and thus, there are no industry standards or norms that might apply. The key issue in resolving this matter, it would appear, would be the question of whether the Managing Director's actions were based on cause or not. If the actions were for cause, similar to an employer terminating an employee for cause, then it would appear that the Managing Director's actions were not unreasonable. Thus, if the Managing Director's actions were for cause, it would seem logical that the Managing Director should be compensated.

Based upon the information reviewed, it is clear that Payne believed that Taylor had abrogated its compensation agreement with him pertaining to the Mitek transaction. Mr. Payne then acted in a fashion that appears reasonable under the circumstances. Payne informed Taylor that unless the compensation matter were resolved, it would be necessary for Payne to terminate his work on the Dow/Sentrachem transaction.

Since Taylor did not compensate Payne for the Mitek transaction, Payne concluded his work on the Dow/Sentrachem transaction following two trips to visit the client in South Africa and after having initiated the sale effort. Payne then handed off the transaction to his subordinate at the time, Ken Griffen, and thus there was no interruption to the client and the transaction was completed successfully.

Because Payne's actions were based upon the failure of Taylor to resolve the Mitek compensation matter, and Taylor's unilateral breach of Payne's Agreement with Taylor, Payne appears to have good cause for his actions. It should also be noted that even though Taylor abrogated the Agreement and denied Payne compensation owed, Payne acted as a professional when, in the process of disengaging himself from Taylor, he made sure that there was no interruption in the processing of the assignment. Accordingly, it appears that Payne should be entitled to his contractual compensation for the Dow/Sentrachem transaction.

## Summary and Conclusion:

A Managing Director in the investment banking industry is considered to be a senior person with many years of experience. A Managing Director is typically compensated in a fashion which is largely tied to the fees earned by the firm and more specifically the contributions (fees generated) by the specific Managing Director. The focus in the investment banking industry is on generating fees which for most transactions are related to the size of the transaction not the hours worked. Thus, compensation of a Managing Director is most typically tied to the amount of the fees earned and not the hours worked. If there were some other basis for determining compensation, such as hours worked, developing junior staff, or other management responsibilities, these would most typically be detailed to the Managing Director at

the outset and not announced with the awarding of a bonus. Finally, Managing Directors typically work as part of a team, the focus of the team being to generate business for the firm. As a senior member of the team, the Managing Director is primarily focused on the overall process and making sure that the project proceeds smoothly. At times, this means relying on others to assist in order to move the process forward. A good Managing Director will know what resources are available and when to use the appropriate resource in order to get the job done.

Employment contracts are common in the investment banking industry. Not that all persons have employment contracts all the time, but rather they are used at certain times or by certain firms with some degree of regularity. When a Managing Director moves from one firm to another, there is typically an employment contract. An employment contract is designed to clarify the terms upon which employment and compensation are or will be based. It is usually designed to minimize confusion or disputes as to responsibilities or compensation. In return for binding the firm to live up to its commitment as specified in the contract, the firm usually has a clause providing for termination under certain circumstances (cause for example). This agreement thus gives the employee some degree of comfort that in return for his/her efforts undertaken on behalf of the firm, then the employee will be justly compensated according to the contract. (An analogy might be the contract (engagement agreement) between the firm and the client. If the transaction closes pursuant to the terms of the engagement agreement, the client pays the firm a fee as previously determined. The main reason in investment banking why firms obtain a signed engagement letter at the outset of a transaction is to avoid problems which might arise at a later stage when the client, having successfully concluded a transaction, might have no further need of the advisor and thus tries to reduce or avoid paying any fee.)

Based upon the foregoing, Payne is entitled to his contractual compensation for the three transactions involved in this Litigation (Mitek, Borden, and Dow/Sentrachem). As per the Agreement between Payne and Taylor, Payne should be compensated the full commission (10% of the proceeds paid to Taylor) for each of the three transactions noted above plus a full additional commission (5% of the proceeds paid to Taylor) for the Borden transaction.

David B. Epstein
Managing Director
Bentley Associates L.P.

11/14/2005 09:58 FAX  12128818328        GILBRIDE, TUSA NY                          ☒001/002
Nov 14 05 08:59a      Bob Payne                                    203-431-8579         p.2

# BENTLEY ASSOCIATES L.P.

101 Park Avenue
22nd Floor
New York, New York 10178
www.bentleylp.com

Tel: 212-972-8700
Fax: 212-972-1820

November 12, 2005

Gilbride, Tusa, Last & Spellane LLC
Attorneys at Law
708 Third Avenue
New York, NY 10017

Attn: James P. Donahue, Jr.

Gentlemen:

    I am writing to confirm the terms of my and my firm's retention to provide consulting services to your firm in connection with your representation of Robert Payne in the litigation Robert Payne et. al. v. Taylor Vision Resources (the "Litigation").

    The services to be performed pursuant to this engagement may include research, the preparation of affidavits, expert reports, attending at and giving deposition and trial testimony and assisting your firm in connection with trial preparation.

    In that connection, I will review the appropriate evidence, documentation and information regarding this transactional dispute and perform such other research and analysis necessary for the purposes of this engagement. I will be prepared to provide timely affidavits and reports as you may request concerning matters relevant to compensation standards utilized in the securities industry, particularly the field of acquisitions and divestitures, which is the subject matter of the Litigation. I will be available for oral testimony at any pre-trial deposition and in court if you and Robert Payne decide to have me serve as an expert witness at trial.

    The fee for this assignment will be based on the time that it requires for appropriate preparation and production of any reports and oral testimony. My time devoted to research, analysis, preparation of affidavits and reports and preparation for testimony will be charged at the rate of $550 per hour. My time spent in providing oral testimony and in participating in depositions and court proceedings will be charged at

Bentley Securities Corporation, an affiliated company, is a registered broker-dealer
and a member of the National Association of Securities Dealers (N.A.S.D.)

11/14/2005 09:57 FAX  12126618328           GILBRIDE, TUSA NY                    ☒002/002
ov 14 05 08:59a      Bob Payne                              203-431-8579         p.3

Gilbride, Tusa, Last & Spellane LLC
November 12, 2005
Page 2

$550 per hour. I will also be reimbursed for any necessary direct out-of-pocket expenses
reasonably incurred in connection with this assignment, as well as $275 per hour for
direct travel time for any trips outside New York City. Monthly statements shall be
prepared detailing my work during that period. Upon exhaustion of the initial retainer,
payment for services and expenses shall be made promptly upon submission of a written
bill to Robert Payne to your attention. An initial, non-refundable retainer fee of $10,000
is payable upon the execution of this engagement.

        The terms of this engagement shall be deemed privileged and confidential and
shall not be disclosed to any third party without your and Robert Payne's written consent.
The documents and information provided to us shall also be treated as confidential and
shall not be disclosed to any third party without your and Robert Payne's written consent,
except as may be necessary to perform the services and obligations required hereunder.
We shall observe any other confidentiality requirements usual and customary and
reasonably requested of us with regard to attorney work product, proprietary or privileged
information or as directed by Court order.

        If this letter accurately states the agreement between us, please so indicate by
signing two copies of this letter and returning one copy to David B. Epstein.

                                        Sincerely,

                                        BENTLEY ASSOCIATES L.P.

                                        By:
                                            David B. Epstein
                                            Managing Director

Agreed and Accepted
as of the Above Date

GILBRIDE, TUSA, LAST & SPELLANE LLC
As Attorneys for Robert Payne

By:
    James P. Donahue, Jr.

DBE:pr

**DAVID B. EPSTEIN**
c/o Bentley Associates L.P.
101 Park Avenue, 18th Floor
New York, NY  10178

## EXPERIENCE

| | |
|---|---|
| 2001/2002 | **Adjunct Teaching** |
| 2002/2003 | Rider University, Lawrenceville, NJ,  Principles of Microeconomics. |
| 2003/2004 | Rowan University, Glassboro, NJ,   Introduction to Economics, Micro. |
| 2004/2005 | Introduction to Economics, Macro. |
| Academic Years | The College of New Jersey, Ewing, NJ,  Money & Banking, Intro. Micro. |

4/91 - Present    **BENTLEY ASSOCIATES L.P., New York, NY**
Managing Director.   Co-Founded this investment banking boutique.
Services include Mergers & Acquisitions, Private Placement Debt and
Equity Financing and Financial Advisory.   Focus on Middle Market
Companies, expertise with family owned businesses.

Projects include: For-Sale Assignments, Venture Equity and Growth Capital
Fund Raising, Valuations and Expert Witness Assignments

6/77 - 4/91    **CITICORP, New York, NY**
1981-1991:    Vice President, Mergers and Acquisitions Department.
Responsible for marketing and processing transactions in a variety of
industries.   Particular focus on:   Retailing, Manufacturing, Insurance,
Construction and Engineering.

- Significant cross-border expertise.   Transaction experience included:
  Exclusive-for-sales, Divestitures, Acquisition Advisory and Searches,
  LBOs, ESOPs and Financings.   Clients ranged from Fortune 100 to
  smaller privately owned family businesses.

- Key person in building a global M&A Department, including:  created
  policies and procedures for coordinating global network, established
  global M&A conferences and status reports, created marketing
  brochures.

- Instrumental in building U.S. Corporate Finance Department including:
  built first New Business Group, developed internal training programs.

1977-1980:  Associate.  Rotating assignments in:  Private Placement, Project
Finance, Currency Swaps, Eurosecurities, Financial Planning and New Business
Development Departments.

David B. Epstein                                                    Page Two


## EDUCATION

May, 1977          **COLUMBIA UNIVERSITY - GRADUATE SCHOOL OF BUSINESS**
                   MBA; Concentrations in Finance and Accounting.
                   Activities:    American Finance Association, member; Management
                                  Consultants, Inc., consultant; Columbia Journal of World
                                  Business, editorial staff

                   **PRATT INSTITUTE**
                   Instructor 1976-1977 (While attending Columbia)
                   Hired to teach three courses: Introduction to Management, Accounting, Small
                   Business Management. Created syllabus, selected texts, taught course and
                   prepared exams.

May, 1974          **BROWN UNIVERSITY**
                   Bachelor of Arts Degree
                   Majors:        Economics; International Relations
                   Activities:    Brown Broadcasting Services, Inc., WBRU (FM)
                                  -   Station Manager of commercially licensed 50,000 Watt FM
                                      Radio Station.
                                  -   Assistant News Director and Public Affairs Director.

## ORGANIZATIONS

                   Brown University Associations:
                          Brown Annual Fund/Development (Former Vice Chair)
                          Brown Club, New York (Former Director)
                   Princeton Club, New York
                   Council on Foreign Relations (Former Term Member)
                   Lincoln Plaza Tenants Corp. (Residential Co-op, NYC)
                          Director, Treasurer (Former President)
                   Blue Hill Troupe, Ltd.
                          (Charity Theatre Group – Gilbert & Sullivan)
                   The Society of Friends of Touro Synagogue (Trustee)

Exhibit J

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF HARTFORD

3
    - - - - - - - - - - - - - - - - -X
4    ROBERT PAYNE and PAYNE INVESTMENTS  :
     LLC                                 :
5                                        : NO. 3:02 CV2234 (AWT)
                     VS                  :
6                                        : JUNE 23, 2004
     TAYLOR VISION RESOURCES, TAYLOR     :
7    STRATEGIC ACQUISITIONS, TAYLOR      :
     STRATEGIC DIVESTITURES and TAYLOR   :
8    FINANCIAL SERVICES, LLC             :
    - - - - - - - - - - - - - - - - -X
9

10                  DEPOSITION OF ROBERT PAYNE

11
    APPEARANCES:
12
         FOR THE PLAINTIFF:
13              JAMES DONAHUE, ESQ.
                GILBRIDE, TUSA, LAST & SPELLANE LLC
14              420 LEXINGTON AVENUE
                NEW YORK, NEW YORK 10170
15

16       FOR THE DEFENDANT:
                JACOB ZELDES, ESQ.
17              ZELDES, NEEDLE & COOPER
                1000 LAFAYETTE BOULEVARD
18              BRIDGEPORT, CONNECTICUT 06604

19              JACOB STEIN, ESQ.
                STEIN, MITCHELL & MIEZINES
20              1100 CONNECTICUT AVENUE N.W.
                WASHINGTON, D.C.  20036
21
                CARLOS LANE, ESQ., IN HOUSE COUNSEL
22              1128 16TH STREET NW
                WASHINGTON, D.C. 20036
23

24
         SHIRLEY SAMBROOK - LICENSED COURT REPORTER
25                    203  259-5903

9

1  decided to leave?
2       A    Yes.
3       Q    How many transactions?
4       A    I don't remember.
5       Q    What arrangements were made for other people to
6  take over those transactions?
7       A    I don't know.
8       Q    Did you ever check back to see whether your
9  leaving caused any problems for WP in ongoing matters?
10      A    No.
11      Q    Did you leave WP on good terms?
12      A    Very.
13      Q    If we wanted to speak with someone at WP
14  concerning your relationship there, who would that be?
15      A    I think it would be, he is no longer there by the
16  way, but it would have been one of the managing directors
17  with whom I worked by the name of Bruno Nolop.
18      Q    I have used the word managing director.  Is that
19  a term of art, so to speak, in the business that you are
20  in?  That is, does it have a meaning peculiar to the people
21  in the business?
22      A    Very much so.
23      Q    Would you define what it is?
24      A    Yes.  A managing director certainly has a certain
25  status within the investment banking industry.  That status

10

1  is one of implied independence to pursue transactions
2  anyway they wish, to organize teams around said
3  transactions and to execute.
4       Q    When you were working with WP, were you the only
5  managing director?
6       A    No.
7       Q    How many did they have?
8       A    I don't know.
9       Q    Could you estimate how many they had, when you
10  left there?
11      A    No.
12      Q    They have more than one?
13      A    Of course.
14      Q    More than ten?
15      A    Yes.
16      Q    When you decided to go with Taylor, were you
17  going there to be a managing director and an equivalent
18  role as you had at WP?
19              MR. DONAHUE: Object to the question, as to
20          whether -- what you mean by equivalent role.
21      A    Jake, I don't understand the question because the
22  firms are so dissimilar it's impossible to characterize
23  roles as being equivalent or not.
24      Q    The letter of engagement that you have with
25  Taylor Companies had the word managing director in it?

11

1       A    Yes.
2       Q    How would you define it for purposes of working
3  with Taylor?
4       A    It is very clear.  My, the conditions, of my
5  hiring was that I was going to be -- I was replacing
6  somebody as a managing director,  that I was going to be
7  the sole managing director within Taylor responsible for
8  divestitures because they had none others at that point.
9  If my syntax correct.  My role was to identify divestiture
10  opportunities and manage transactions.
11              MR. STEIN: Would you mark this as, the
12          November 20, 1999 letter which says, Dear Bob,
13          would you mark this as number 2.
14              (Whereupon a letter, 11-20-99, was marked as
15          Defendants' Deposition Exhibit 2 for
16          Identification.)
17      Q    Looking at the first line, do you see the words
18  sole managing director in the first paragraph?
19      A    No.
20      Q    Is it your position that that was an agreement
21  made orally -- that you were the sole managing director?
22      A    Yes.
23      Q    Is there any reason why you didn't put it in this
24  agreement?
25      A    No.  Yes, because I trusted Mr. Taylor.

12

1       Q    Did you want an agreement in writing?
2       A    This was my agreement in writing.
3       Q    Did you read it before you accepted it?
4       A    Of course.
5       Q    And you saw that the word sole was not there?
6       A    Agreed.
7       Q    Under your agreement,  I believe you said one of
8  the things that attracted you was you would work out of
9  your home?
10      A    Yes.
11      Q    What did you understand you were going to do with
12  Taylor when you -- when you commenced there?  You were
13  going to get a yearly salary of how much?
14      A    It was not actually listed as a salary.  It was
15  listed as, you see on Exhibit 2, a draw against commissions
16  of one hundred twenty-five thousand.
17      Q    What did you expect to do once you began getting
18  that draw against commissions?  What were you going to do
19  to, if I may use the expression, earn that draw?
20      A    Firstly, I cannot live on one hundred twenty-five
21  thousand dollars a year and, so, I would not have joined
22  Taylor, if this is my expectation of salary.  Hence --
23      Q    Why are you so definite about that, that you
24  couldn't live on one hundred twenty thousand dollars a
25  year?

81

1                            CERTIFICATION
2       STATE OF CONNECTICUT
                                 ss: Bridgeport
3       COUNTY OF FAIRFIELD:
4
5            I, Shirley Sambrook, a Notary Public duly
        commissioned and qualified in and for the County of
6       Fairfield, State of Connecticut, do hereby certify that
        pursuant to agreement of counsel there came before me on
7       the 23rd day of June, 2004 at the offices of Zeldes, Needle
        & Cooper, 1000 Lafayette Boulevard, Bridgeport,
8       Connecticut, the following named person, to wit, ROBERT
        PAYNE, who was by me duly sworn to testify to the truth and
9       nothing but the truth of his knowledge touching and
        concerning the matters in controversy in this cause; that
10      he was thereupon carefully examined upon his oath, and his
        testimony reduced to writing under my supervision, that the
11      deposition is a true record of the testimony given by the
        witness.
12           I further certify that I am neither attorney or
        counsel for, nor related to or employed by any of the
13      parties to the action in which this deposition is taken,
        and further that I am not a relative or employee of any
14      attorney or counsel employed by the parties thereto or
        financially interested in the action.
15
             In witness thereof, I have hereunto set my hand and
16      affixed my notarial seal this ___ day of June,
        2004.
17
        My Commission Expires:
18                                     SHIRLEY SAMBROOK, LCR
              2008                      Notary Public
19
20
21
22
23
24
25

# Exhibit K

*Taylor Companies*

November 20,   1999

Taylor Companies

Mr. Robert Payne
VIA FACSIMILE:  (203) 431-9746

Taylor Vision Resources
Taylor Strategic Acquisitions
Taylor Strategic Divestitures
Taylor Executive Solutions
Taylor Capital
Taylor Global Trading

Helping our clients
achieve purposeful
change to optimize
shareholder value

Dear Bob:

I am pleased to offer you the position of Managing Director at Taylor Companies (Taylor).  The terms of our mutual understanding are as follows:

Commissions of 10.0% will be paid on net revenues (gross revenues collected less senior advisor compensation) from contracts which you manage the transaction or project.

An additional 5.0% commission will be paid on net revenues from contracts which you take responsibility for leading the marketing efforts with companies which Taylor has not served prior to your employment with us. These marketing efforts include visualization of the opportunity, initial telephone contact, presentation of Taylor Companies materials, and contract closure.  Contract closure should be completed without the assistance of any executive level Taylor personnel.  In those instances in which another Taylor executive directly assists in contract closure, the aforementioned percentage will be reduced to 2.5%.

On the first $1,500,000 net revenues generated from you leading the marketing efforts, Taylor will pay a bonus commission of 5% above all commissions previously mentioned.  Here again, this percentage will be reduced to 2.5% in those instances in which another Taylor executive directly assists in contract closure.  This bonus commission is offered in the spirit of making you whole towards the $75,000 bonus which you are forfeiting with your present employer.

Annual draw against commissions will be $125,000.

Once commissions earned exceed the annual base draw in any calendar year, commissions due will be paid monthly.  There will be no true-up or carryover of annual short fall from draws advanced exceeding commissions earned.



PLAINTIFF'S EXHIBIT

1

ALL-STATE LEGAL®

04528

1215 Nineteenth Street NW   Washington DC 20036   Phone 202. 955 1330   Fax  202. 293 1862

Mr. Robert Payne
November 20, 1999
Page 2

Taylor will provide you a laptop computer and cover the costs of your telecommunications needs including hookups and cellular phone expenses.

All medical, dental, and life insurance premiums shall be paid on your behalf after 30 days employment in a manner consistent with our group benefits programs.

You will be eligible to participate in our 401(k) plan after 30 days. Taylor Companies matches 25% of your contributions up to the statutory limits. Entrance dates for the plan are at the beginning of each calendar quarter.

You will be eligible for three weeks of paid vacation during your first year with the firm. The company requires that all employees take vacation during the period between Christmas and New Year's Day.

Taylor is in the process of developing a retirement plan specific to the Managing Director's position. While this plan is still in a conceptual form, we anticipate that it will include an annuity to be paid beginning at retirement which corresponds to the person's tenure with the firm as well as future profits generated in his corresponding client base.

It is our understanding that you will be available to begin employment with us on January 3, 2000.

Please contact Ralph or me at your earliest convenience regarding the acceptability of this offer. Upon your acceptance, these terms will be formalized into an employment contract by our attorney.

I apologize for the delay in getting you this letter. We are looking forward to a long and mutually fulfilling relationship.


Kindest regards,


Kenneth H. Griffin, CPA
Chief Financial Officer
Chief Operating Officer

04529